**UNITED STATES of America,
Appellee,**

v.

**Frank H. DELLAPIA, Appellant.
No. 49, Docket 34858.**

United States Court of Appeals,
Second Circuit.

Submitted Sept. 14, 1970.

Decided Oct. 20, 1970.

---

decent, filthy or vile." [2]  This appeal requires us to reinterpret the Act in the light of constitutional doctrine which never illuminated the problems of obscenity legislation with glaring brightness but which now appears to be shifting as well.  In particular, the Supreme Court's recent decision in Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), sheds light on the area from a new perspective.

In early 1967 Earl Eugene Gerard, of Westminster, California, and his fiancee Miss Priscilla Yabarra, placed a small advertisement in a magazine known as *Swinger's Life*.  This notice—like others they had placed in similar periodicals—announced their desire to hear from "other photo-collectors and liberal-minded couples."  The issue carrying their advertisement reached the news stands that summer, and on October 26 appellant Frank Dellapia, then a civilian Navy employee living in New York City, responded.  He wrote that he was a "collector of exotica," including "real stag films * * * definitely not to be shown to minors."  "Let me know if you are interested," his letter concluded, "and tell me of your experiences."  Gerard replied that he and his fiancee were indeed interested in the films.  Dellapia then sent a handwritten list of thirty-three movies that he had available, including such colorful titles as "Zorro's Girls," "Willing and Able," and "Young Blood—Parts 1 and 2."  During the next several weeks, Gerard asked for and received several films; Dellapia in turn was enthusiastic in his praise for several pornographic photographs and stories mailed to him by Gerard.[3]  In

Herbert S. Siegal, New York City, for appellant.

Edward R. Neaher, U. S. Atty. (Edward John Boyd, V., Asst. U. S. Atty., of counsel), for appellee.

Before WATERMAN, MOORE and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

For ninety-seven years the Comstock Act, named after one of the nineteenth century's most vigorous moral evangelists,[1] has barred from the mails all matter "obscene, lewd, lascivious, in-

---

1. For a biography of this colorful figure, see H. Broun & M. Leech, Anthony Comstock: Roundsman of the Lord (1927).

2. 18 U.S.C. § 1461.

3. It is not at all clear that everything Dellapia received was pornography.  On January 10, 1968, Dellapia wrote to Gerard:

   Dear Earl, * * * Enjoyed as usual your stories and photos.  They are terrific. (sic) That drawing is out of this world.  Reminds me of cartoon booklets they had in Mullins, Popeye, etc.  The guy who did it is very good.  Like to see more of them plus your hot stories and pictures. * * *

   A similar letter from Dellapia to Gerard is dated January 18:

   Dear Earl, your pictures and stories are as good as ever.  Please keep sending them as I thoroughly enjoy them.  This artist was the most. * * *

late February 1968, Gerard wrote Dellapia enclosing the names of fifteen films he would like to see, and postal money orders totaling $150. On February 27, Dellapia deposited the package containing Gerard's requested films in the mails at ·Bush Terminal Station in Brooklyn. That very day, however, a United States Marshal and two Postal Inspectors arrested Gerard at his home for sending obscene matter through the mail in violation of the Comstock Act.[4] The officials also discovered Gerard's sizable private collection of sex films.

The officers also learned that Gerard was soon to receive another batch of films from Dellapia. When the films arrived two days later, Gerard took the package to his attorney's office, where it remained unopened for some three months, until the day scheduled for Gerard's trial, June 11. On that day Gerard opened the package in the presence of his attorney and one of the Postal Inspectors who had participated in Gerard's arrest. Shortly thereafter, Gerard changed his plea to guilty and received a three-year suspended sentence. The package of films he had asked Dellapia to send him was promptly forwarded to postal authorities in New York City.

Dellapia's one-count indictment and jury trial for violating the Comstock Act followed. At the conclusion of the government's case, Dellapia moved for a judgment of acquittal on the ground that his mailing was "private correspondence" between Gerard and himself and therefore protected by the first amendment. The motion was denied.

## I.

■ We would willingly avoid the profound and perplexing issues suggested by Dellapia's asserted right of privacy could we find the films otherwise protected by the first amendment. But after viewing three films stipulated by the parties as fairly representative of the lot, we have no doubt at all that the films are obscene in the constitutional sense.[5] Until quite recently this finding would have ended at least an unprophetic analysis of these facts, presenting as they do no procedural, jurisdictional, or other questions peripheral to the first amendment defense. "Obscenity is not within the area of constitutionally protected speech or press." Roth v. United States, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957).[6]

Roth's instruction that the harmfulness of obscenity need not be demonstrated before it is banned created an enclave outside the first amendment for "obscene" speech. It is not surprising that the battle lines were quickly transferred to the definitional question of what was "obscene." The difficulties of mediating on that front have become all too apparent in the succeeding fourteen years. The saga of a badly-divided Court[7] struggling to shape a comprehensive and comprehensible definition of obscenity has been told often and well

---

4. The obscene matter consisted of films that Gerard had received from Dellapia and remailed. There was no evidence that this remailing was intended for other than the private enjoyment of the recipient.

5. It is this court's function to make this judgment, Jacobellis v. Ohio, 378 U.S. 184, 190, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964), applying criteria laid down in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), as elaborated in subsequent cases and recently restated in A Book Named "John Cleland's Memoirs" v. Attorney General of Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966).

6. Roth's formula was explicitly reaffirmed in Ginsberg v. New York, 390 U.S. 629, 635, 641, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), in an opinion endorsed by six members of the Court.

7. See Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967); cf. Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (five separate opinions, one concurrence without opinion).

enough elsewhere to excuse non-repetition here.[8]

A new chapter was written in *Stanley*, when the Court announced that the "mere private possession of obscene matter * * * cannot constitutionally be made a crime." 394 U.S. at 559, 89 S.Ct at 1245, 22 L.Ed.2d 542. The Court did not question that there is "a valid governmental interest in dealing with the problem of obscenity." *Id.* at 563, 89 S.Ct. at 1246–1247. Justice Marshall spoke for six members of the Court[9] in finding that the Georgia statute punishing mere possession of obscenity unjustifiably infringed Stanley's first amendment rights "to receive information and ideas" regardless of their social worth and "to be free, except in very limited circumstances, from unwanted governmental intrusions into [his] privacy." *Id.* at 564, 89 S.Ct. at 1247–1248.

We would be putting a gloss over *Stanley* were we to reject out of hand Dellapia's claim to its protection by noting in wooden fashion that he was not prosecuted for mere possession. Where does *Stanley* locate the boundary between the government's right to control obscene matter deemed inimical to public order or the public morality and the right of individuals to keep to themselves? Is there a first amendment privilege to exchange and enjoy in private, letters, stories, books, movies—or spoken words—however sordid? After *Stanley*, we do not see that we can answer these questions other than by a case by case accommodation of legitimate, competing interests.[10]

Especially pertinent to this analysis is certain language that the Court used in *Stanley* to reconcile earlier decisions and describe hypothetical situations that would fall outside the Court's holding. The right to privacy of thought does not extend, we were told, to *"public* distribution or dissemination" of obscene matter, 394 U.S. at 561, 89 S.Ct. 1243, 22 L.Ed.2d 542 (emphasis added). Similar language appears twice elsewhere in the majority opinion. *Id.* at 563, 89 S.Ct. 1243 ("commercial distribution"), 566, 89 S.Ct. 1243 ("public dissemination"). We believe that these words were not used inadvertently. Clearly, the Court did not intend that one forfeit the shelter of *Stanley* merely by sharing his private collection of obscenity with another for his private use. As we shall see, Dellapia was neither indicted nor convicted for "public" distribution within the meaning of *Stanley*.[11] Since the government has shown no special circumstances that would justify its prose-

---

8. Monaghan, Obscenity 1966: The Marriage of Obscenity Per Se and Obscenity Per Quod, 76 Yale L.J. 127 (1966); Kalven, The Metaphysics of the Law of Obscenity, 1960 Sup.Ct.Rev. 1. See also, United States v. Various Articles of "Obscene" Merchandise, 315 F.Supp. 191 (S.D.N.Y., filed June 8, 1970) (three-judge court).

9. Justices Brennan, Stewart, and White concurred in the result but would have found an illegal search and seizure. 394 U.S. at 569, 89 S.Ct. at 1250.

10. It has been suggested that *Stanley* "completed a process, hinted at in Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967) of shifting the ground for decision in obscenity cases away from the doctrine announced in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) * * * to a more traditional balancing-of-interest approach." United States v. Various Articles of "Obscene" Merchandise, *supra.*

11. Judge Mishler apparently recognized the thrust of *Stanley* when he charged the jury that it could not convict Dellapia if it found that "this was just a private exchange between the defendant and Mr. Gerard." Whatever the jury understood by these words, there is no evidence in the record to sustain a finding that this was anything but a "private exchange." There was not a shred of evidence that Dellapia offered the films for sale to the general public. Nor did the government show that Dellapia made a profit on his transactions with Gerard. Viewed against the background of the friendly exchanges that had transpired between the two, see note 3, *supra*, it is likely that Gerard's payments of ten dollars per film were no more than reimbursements to Dellapia for his out-of-pocket costs.

cution of Dellapia in the face of *Stanley*, his conviction must be reversed.

## II.

In so deciding, we need not question the doctrine that under *Roth* obscenity remains unprotected by the first amendment.[12] Indeed, the protected sphere indicated by *Stanley* was anticipated by Justices Stewart and Harlan as early as 1961,[13] and by Chief Justice Warren, concurring in *Roth* itself.[14]

In any event, it is clear that *Stanley* expressly recognizes a continuing state interest in regulating obscenity. Familiar foci of state concern include possible harm to Dellapia and his correspondents from their own use of the obscene films; harm that they might do to others as a result of viewing the films; harm that might be done if the films reached other eyes than Dellapia's and Gerard's (especially minors'); and any deterioration in public morals that might result if the government is powerless to proscribe such activity as Dellapia's.[15]

Each of these likely public interests was implicit in *Stanley* as well, where the Court found them of no avail to the government. Invoking familiar first amendment analysis, the Court suggested that criminal sanctions would more appropriately attach to criminal behav-ior itself, rather than to its antecedents in speech—in the unlikely event that some anti-social conduct could be traced to viewing pornographic films. 394 U.S. at 566–567, 89 S.Ct. 1243, 22 L.Ed.2d 542. Nor was prosecution of Stanley justified as a way to control his illicit thoughts. *Id.* at 565, 89 S.Ct. 1243. As one commentator has put it, an individual's own "atavistic reactions to pornography" are constitutionally inadequate to support censorship.[16]

Like *Stanley*, Dellapia did not "pander"[17] or otherwise intrude himself upon public sensibilities. He did not mail obscene films to unsuspecting recipients or display his wares on some streetcorner.[18] Far from catering to the impressionable young, Dellapia included in his first response to Gerard's invitation a warning that his films were "not for minors."[19] Indeed, Dellapia cannot even be held to account for planting an interest in the obscene in an otherwise innocent mind, for not he but Gerard had been responsible for placing the ad in *Swinger's Life*.

Although the words "public decency" carry with them uncertainty and imprecision, it is difficult to quarrel with the proposition that things public should be decent. We are increasingly aware of polluted air, rivers, and streets, and we

---

12. See note 6, *supra*; note 22, *infra*.

13. Mapp v. Ohio, 367 U.S. 643, 672, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Justice Harlan, joined by Justices Frankfurter and Whittaker, thought that Mapp's conviction could more easily be reversed on the rationale adopted seven years later in *Stanley* than on the ground taken by the majority in *Mapp*. *Id.* at 675, 81 S.Ct 1684.

14. Roth v. United States, 354 U.S. 476, 494, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Cf. Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919):

    [T]he character of every act depends upon the circumstances in which it is done. * * * The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic.

15. See, e. g., T. Emerson, Toward a General Theory of the First Amendment 90–91 (1963); Krislov, From Ginzburg to Ginsberg: The Unhurried Children's Hour in Obscenity Litigation, 1968 Sup. Ct.Rev. 153, 157.

16. Krislov, *supra*, at 157.

17. See Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).

18. In Redrup v. New York, 386 U.S. 767, 769, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967) the Court pointed to a special concern for juveniles, regulation of "pandering," and protection against "obtrusive" publication of obscenity as three specific justifications for outlawing obscenity.

19. See Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (special state interest in children's development justifies appropriate regulation of "nonobscene" matter).

resent their assault upon our senses. When there is inflicted upon one a sexually offensive public display, his right to be let alone [20] is impaired. Things unobjectionable in private may be embarrassing and offensive in a crowd, and the general public includes adults as well as children. By our decision we do not sanction "the public affront." [21]

These legitimate concerns, however, are as remote from this case as they were from *Stanley*. Gerard was not assailed by Dellapia; he importuned Dellapia's cooperation in the exercise of his own free selection of viewing matter. Since *Stanley* held inadequate the tenuous harms attendant on a choice such as Gerard's, the controlling question is whether Dellapia's privacy is less worth protecting than Stanley's.

### III.

In suppressing Dellapia's films when they came into Gerard's hands, the government entered upon a constitutional danger area. The Supreme Court long since abandoned any thought of tracing the "elusive" line "between the informing and the entertaining." Winters v. New York, 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840 (1948). See Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501, 72 S.Ct. 777, 96 L.Ed. 1098 (1952). Indeed, the *Stanley* court may have eroded somewhat the underpinnings of *Roth* by invoking this principle to dismiss the argument that *Stanley's*

obscene films were "worthless" and hence unprotected. 394 U.S. at 566, 89 S.Ct. 1243.[22] Whenever the criminal law is brought to bear against "a work of expression," Jacobellis v. Ohio, 378 U.S. 184, 190, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964), the government risks encouraging self-censorship of protected expression from an excess of caution, Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959), particularly when the prosecution treads the "dim and uncertain" boundary between protected and constitutionally worthless speech. Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 66, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

Because we are dealing with the first amendment, our sensitivity to incursions upon privacy must be a quantum greater than it would be were we reviewing laws prohibiting the possession of marihuana, People v. Aguiar, 257 Cal.App.2d 597, 65 Cal.Rptr. 171 (Ct.App.1968), cert. denied, 393 U.S. 970, 89 S.Ct. 411, 21 L. Ed.2d 383 (1968), or requiring motorcyclists to don helmets, American Motorcycle Ass'n v. Davids, 11 Mich.App. 351, 158 N.W.2d 72 (1968). We are concerned with Dellapia's privacy not merely for its own sake, but because this kind of prosecution bristles with hazards to free speech. We need not read *On Liberty* into the due process clause to decide this case.[23]

### IV.

The remaining question thus is not simply whether Dellapia forfeited

---

20. Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

21. Proceedings, Twenty-Ninth Ann.Judicial Conf., 3rd Jud.Cir. of the United States, 42 F.R.D. 437, 503 (1966). Cf. Public Utilities Comm'n v. Pollak, 343 U.S. 451, 466, 72 S.Ct. 813, 96 L.Ed. 1068 (separate opinion of Justice Black), 467, 72 S.Ct. 823 (Douglas, J., dissenting) (1962); Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949).

22. *Roth* seemed to intimate that obscenity was unprotected because it was worthless. Obscene expression plays "no essential part of any exposition of ideas, and [is] of * * * slight social value as a step

to truth * * *." 354 U.S. at 485, 77 S.Ct. at 1309, quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). The Court dismissed the contention that Stanley's films might be devoid of ideological content by echoing *Winters*. 394 U.S. at 566, 89 S.Ct. 1243.

23. The only purpose for which power can be rightfully exercised over any member of a civilised community, against his will, is to prevent harm to others. His own good, either physical or moral, is not a sufficient warrant.

  J. S. Mill, On Liberty, quoted in Note, Limiting the State's Police Power: Judicial Reaction to John Stuart Mill, 37 U.Chi.L.Rev. 605 (1970).

the protection of *Stanley* by shucking off the shell of some diffuse and undifferentiated "privacy" by sending his films to Gerard. The privacy that *Stanley* protects is the privacy of confidential communication or the privacy of being let alone if the communication does not harm others, not privacy in any other aspect. In *Stanley* the Court protected the "confidential communication" between a solitary viewer and a dirty movie or the right to be let alone with that movie—no matter how abhorrent the film may have been. We cannot believe that Dellapia, Gerard, and Miss Yabarra became less entitled to privacy from public intrusion or public sanctions when they willingly shared similar protected private experiences among themselves only. Each of the three merely responded to the others' "right to read or observe" whatever they pleased in the privacy of their own homes. 394 U.S. at 568, 89 S.Ct. 1243.[24] It would be anomalous to prevent consenting adults from freely passing among themselves obscene material which *Stanley* tells us each of them was entitled to possess and view or read. Cf. Martin v. Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943).[25] Solitude or isolation has never been a precondition to the Constitution's protection of other phases of the right of privacy. See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). The first amendment protects others than the "hermit and the recluse." [26]

Nor can we consider that this private relationship is any less private because the correspondence and films passed through the public mails. "[T]he use of the mails is almost as much a part of free speech as the right to use our tongues * * · *." United States ex rel. Milwaukee Social Democratic Publ. Co. v. Burleson, 255 U.S. 407, 437, 41 S. Ct. 352, 363, 65 L.Ed. 704 (1921) (Holmes, J., dissenting). "Letters * * * in the mail are as fully guarded * * * as if they were retained by the parties forwarding them in their own domiciles." Ex Parte Jackson, 96 U.S. 727, 733, 24 L.Ed. 877 (1878).[27]

The most fundamental premise of our constitutional scheme may be that every adult bears the freedom to nurture or neglect his own moral and intellectual growth.[28] In a democracy one is free to

---

24. See note 11, *supra.*

25. We cannot believe that the Supreme Court intended to protect Stanley's right to receive whatever messages or impulses his films yielded, while not protecting at least some methods for conveying the films to him. In a variety of other contexts, the Supreme Court has treated the first amendment rights to transmit and to receive as cognate. E. g., Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (right to receive implies right to unimpeded delivery by mail); Marsh v. Alabama, 326 U.S. 501, 508–509, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (right to receive implies right to distribute literature on sidewalk). Cf. Griswold v. Connecticut, 381 U.S. 479, 482–483, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (myriad and complementary facets of first amendment protection).

26. A. Westin, Privacy and Freedom 39 (1962).

27. As early as 1792, persons in the postal service were forbidden to open a letter, and Justice Story wrote in 1841 that involuntary disclosure of the contents of private mail "strikes at the root of all that free and mutual interchange of advice, opinions, and sentiments, between relatives and friends, and correspondents, which is so essential to the well-being of society. * * *" A. Westin, *supra*, 335–36.

28. In Meyer v. Nebraska, 262 U.S. 390 at 402, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), Mr. Justice McReynolds expressed this nation's repudiation of the principle that a State might so structure its institutions as to "foster a homogenous people":

In order to submerge the individual and develop ideal citizens, Sparta assembled the males at seven into barracks and intrusted their subsequent education and training to official guardians. Although such measures have been delib-

work out one's own salvation in one's own way. If there is a justification for this premise, it is the faith—or the calculation—that to relinquish freedom of self-development would be to abandon most that is valuable about living. Government censorship of an adult's private thoughts would, as *Stanley* recognized, raise havoc with the individual's personality. The danger to freedom would hardly be less if private correspondents should need to fear that the government will monitor their private mail and mark the emotions and ideas privately revealed therein with a criminal stigma.[29] If the only reason for a prosecution is to protect an adult against his own moral standards which do harm to no one else, it cannot be tolerated.[30] Private communication seems no less part of freedom than privacy to read one's own books. If not, then the privacy that *Stanley* held inviolable is less robust than we would have thought.

We would not approach Dellapia's assertion of privacy with the same solicitude if he was, in Professor Freund's

phrase, "supping at the public table."[31] It may be that one who would claim first amendment protection of his privacy could, as under the fourth amendment, "break the seal of sanctity and waive his right to privacy," Lewis v. United States, 385 U.S. 206, 213, 87 S. Ct. 424, 428, 17 L.Ed.2d 312 (1966) (Brennan, J., concurring), by for example *engaging in a commercial enterprise*. Public display of obscenity even to consenting adults, or private possession with an intent to distribute publicly, present cases which are not before us.[32] Booksellers will not as a result of our decision today be free to maintain "emporium[s] for smut."[33] See Karalexis v. Byrne, 306 F.Supp. 1363 (D.Mass. 1969), prob. juris. noted, 397 U.S. 985, 90 S.Ct. 1123, 25 L.Ed.2d 394, restored to calendar for reargument, 399 U.S. 922, 90 S.Ct. 2235, 26 L.Ed.2d 789 (1970).[34]

Accordingly, Dellapia's mailing of films was protected by the first amendment. We need not reach the question whether the Comstock Act is

erately approved by men of great genius, their ideas touching the relation between individual and State were wholly different from those upon which our institutions rest; and it hardly will be affirmed that any Legislature could impose such restrictions upon the people of a state without doing violence to both letter and spirit of the Constitution. (quoted with approval in Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 511–512, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969)).

29. J. Rosenberg, The Death of Privacy 153 (1969):
    We must * * * be given the chance to decide to whom we will entrust our thoughts, and to whom we will reveal our secrets * * *.

30. See A. Westin, *supra*, 39–42.

31. Proceedings, *supra*, 495.

32. See cases cited, Stanley v. Georgia, 394 U.S. 557, 561–562, nn. 6, 7, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). Cf. American Law Institute, Model Penal Code § 251.-4(2) (d), (3) (b) (Proposed Official Draft, 1962) (would penalize one who "knowingly * * * possesses any obscene material for purposes of sale or oth-

er commercial dissemination; but would give an affirmative defense in cases of "non-commercial dissemination to personal associates").

33. Smith v. California, 361 U.S. 147, 160, 161, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) (Frankfurter, J., dissenting).

34. United States v. Reidel (S.D.Cal., filed June 8, 1970), cert. granted, 39 U.S.L.W. (1970), 400 U.S. 817, 91 S.Ct. 67, 27 L.Ed.2d 44 (unconstitutional to prohibit mailing of obscene matter to one who uses mails for commercial distribution to willing buyers who state they are adults); United States v. Thirty-Seven Photographs, 309 F.Supp. 36 (C.D.Calif., filed January 27, 1970) (three-judge court), cert. granted, 400 U.S. 817, 91 S.Ct. 34, 27 L.Ed.2d 44 (1970) (unconstitutional to exclude from the United States obscene photographs imported for use by adults in the privacy of their own homes); Stein v. Batchelor, 300 F. Supp. 602 (N.D.Tex.) (three-judge court), prob. juris. noted 396 U.S. 954, 90 S.Ct. 428, 24 L.Ed.2d 419 (1969) (holding unconstitutional state statute proscribing knowing possession of obscene material).

unconstitutional, for we construe that Act's broad prohibition as subject to an underlying requirement that the mailing trespass upon a valid governmental interest which constitutionally justifies invasion of a private consensual relationship such as that between Dellapia and Gerard.[35] The record is barren of any evidence which would satisfy this requirement. Should the government choose to retry Dellapia, it will have an opportunity to introduce the essential facts.

---

35. Among previous judicial glosses upon the Comstock Act are the requirements: (1) that the material not only be "obscene, lewd, [etc.]," but that it also have the effect of appealing to the beholder's prurient interest and that it offend national standards of decency, Manual Enterprises, Inc. v. Day, 370 U.S. 478, 483–486, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962) (opinion of Harlan, J.) ; see also United States v. Klaw, 350 F.2d 155, 164 (2d Cir. 1965) (above limitations plus utter lack of redeeming social value) ; (2) that the offensive material not be a "classic" work, e. g., Roth v. Goldman, 172 F.2d 788 (2d Cir.), cert. denied, 337 U.S. 938, 69 S.Ct. 1514, 93 L.Ed. 1743 (1949). (3) that the offensive material not be mailed to one who has a professional interest in it, e. g., Walker v. Popenoe, 80 U.S.App.D.C. 129, 149 F.2d 511 (1945).

A significant further narrowing of the statute results from the decision of the Justice Department to limit prosecutions to "those cases involving repeated offenders or other circumstances which may fairly be characterized as aggravated." See Redmond v. United States, 384 U.S. 264, 265, 86 S.Ct. 1415, 1416, 16 L.Ed.2d 521 (1966).