**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Albert P. PACIONE, Jr.,**
**Defendant-Appellee.**

**No. 864, Docket 83–1407.**

United States Court of Appeals,
Second Circuit.

Argued March 20, 1984.

Decided June 27, 1984.

Stephen F. Markstein, Asst. U.S. Atty., S.D. of N.Y., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Martin L.

Perschetz, Asst. U.S. Atty., New York City, of counsel), for plaintiff-appellant.

Gerald J. McMahon, New York City, for defendant-appellee.

Before LUMBARD, NEWMAN and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

The issue raised on this appeal is whether a creditor who seeks to enforce a usurious loan by recording a conveyance of real property that recites a false consideration can be prosecuted under the federal "loan sharking" statute, 18 U.S.C. § 891 *et seq.* (1982). Holding that the creditor could not be so prosecuted, the United States District Court for the Southern District of New York, Whitman Knapp, *Judge*, dismissed five counts of a fifteen-count indictment against defendant Albert Pacione, Jr. The government contends on appeal that the district court's interpretation of the statute was too narrow. We disagree, and accordingly affirm.

## I. BACKGROUND

The facts claimed by the government are taken as true for purposes of this appeal, *United States v. Von Barta*, 635 F.2d 999, 1002 (2d Cir.1980), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981). In 1979 Robert Verrelli and Daniel Maher wanted to exhibit an airplane that had belonged to the late Elvis Presley. Unable to obtain financing from other sources, Verrelli sought a loan from Vincent Aprile, who together with his attorney, defendant Albert Pacione, Jr., agreed to lend Verrelli and Maher $25,000 in return for their promise to repay $37,500 after the exhibition. As security for repayment, Verrelli's mother-in-law, Rose Dorner, executed a mortgage on her home in favor of Pacione's law firm for $37,500.

Pacione prepared the mortgage, which falsely recited that the amount owed was $37,500, and that it was to be repaid by October 26, 1979, "at no rate of interest". Pacione and Aprile told Dorner that if Verrelli and Maher did not repay the loan, the mortgage would be recorded and would create a lien against her property. Although the exhibition on October 20, 1979, was a financial failure, Dorner promptly repaid $37,500 to Pacione and Aprile and received back the unrecorded mortgage marked "Paid in full".

Notwithstanding their first failure, Verrelli and Maher planned a second exhibition of the Presley airplane and again sought financing from April and Pacione, who this time agreed to lend them $20,000 in return for a promise to repay $30,000 by December 3, 1979. As security for the second loan, Maher and his wife executed a trust deed to their home in favor of Pacione's law firm as trustees. The deed falsely recited that the Mahers had received $30,000 as consideration for the conveyance; in fact they had received only the $20,000 loan.

The second exhibition also flopped, and when the Mahers were unable to repay the loan, Pacione, on January 9, 1980, submitted the deed to the county clerk of Orange County, New York, for recording. Pacione's law firm later conveyed the property to Aprile, who sold it to a third party.

Even though the Mahers had lost their home, Aprile allegedly continued to press them for repayment, and at one point sought to recruit a third person to beat up Maher. However, these alleged steps towards violence are not relevant to this appeal, because the government conceded before Judge Knapp its inability to prove that Pacione was associated with, or even aware of, any of the threats allegedly made by his client and co-lender, Aprile.

The indictment charged Pacione and Aprile with violations of the extortionate credit transactions statute, as well as other offenses. Insofar as relevant here, it charged that Pacione and Aprile conspired to make extortionate extensions of credit, in violation of 18 U.S.C. § 892(a) (count 1), committed substantive violations of the same section (counts 2 and 3); conspired to collect an extension of credit through the use of extortionate means, in violation of 18 U.S.C. § 894(a) (count 4); and used ex-

tortionate means to collect an extension of credit, in violation of 18 U.S.C. § 894(a) (count 6).

Pacione moved to dismiss these counts of the indictment, claiming that his conduct was not what congress meant to prohibit in the extortionate credit statute. Rather, Pacione argued, congress intended the statute to embrace only such violent conduct as "the classic loan shark scenario of 'I'll burn your house down if you don't pay me my 1000% interest' ".

The district court granted Pacione's motion. Judge Knapp agreed with Pacione's contention "that the totality of facts asserted by the government to be provable against [Pacione] do not establish a violation of the statute." Noting that Pacione made "no threats of any sort to anyone", he concluded that "[f]iling a usurious mortgage may be illegal, but it is not 'criminal' in the sense that the word is used in [the extortionate credit transactions] statute."

## II. DISCUSSION

Our starting point in interpreting this statute must, of course, be its language, *Lewis v. United States,* 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980). Critical to this appeal are the definitions of "extortionate extension of credit" and "extortionate means" set forth in subsections (6) and (7), respectively, of 18 U.S.C. § 891, particularly the meaning to be given to the phrase "other criminal means" in the context of "violence or other criminal means". Section 891(6) provides:

An extortionate extension of credit is any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of *violence or other criminal means* to cause harm to the person, reputation, or property of any person. (Emphasis added).

Section 891(7) provides:

An extortionate means is any means which involves the use, or an express or implicit threat of use, of *violence or oth-*

*er criminal means* to cause harm to the person, reputation, or property of any person. (Emphasis added).

The government contends that Pacione's threats to record the Dorner mortgage and the Maher deed constituted threats to use "other criminal means" which bring the usurious loans within the term "extortionate extension of credit" as defined by 18 U.S.C. § 891(6). The government also contends that the actual recording of the Maher deed, with its false recitation of consideration, constituted use of "other criminal means" to collect a usurious loan, thus transforming Pacione's activity into "extortionate means" as defined by 18 U.S.C. § 891(7).

Under the government's theory the "criminal means" is the filing of a mortgage or deed containing false information, conduct that allegedly is a crime under New York Penal Law § 175.30 (McKinney 1975), which provides:

A person is guilty of offering a false instrument for filing in the second degree when, knowing that a written instrument contains a false statement or false information, he offers or presents it to a public office or public servant with the knowledge or belief that it will * * * become a part of the records of such public office or public servant.

The prosecution thus urges that the phrase "other criminal means" should be broadly interpreted to encompass "means that are nonviolent yet nevertheless in violation of some criminal statute." Significantly, however, congress has not said *"any* other criminal means" or *"all* other criminal means". Rather, it has simply proscribed "other criminal means" and qualified that phrase by using it only in conjunction with, and following, "violence". Subsection (6) refers to the "use of violence or other criminal means", and subsection (7) to the "use, or an explicit or implicit threat of use, of violence or other criminal means". An issue of interpretation therefore arises as to whether "other criminal means" should be read to proscribe conduct

akin to violence, under the principle of *ejusdem generis,* or whether the phrase should be broadly read to include *any* criminal means, as the government contends. The meaning of the phrase "other criminal means" is sufficiently ambiguous to require us to examine legislative history in order to ascertain its intended scope.

The legislative history of the extortionate credit transactions statute can best be understood against the background of the problem congress sought to solve. In 1967 and 1968, congress began to devote substantial attention to the activities of organized crime. A report prepared by a presidential task force on organized crime revealed that loan sharking—the loaning of money at usurious interest rates—was organized crime's second most profitable enterprise. President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Organized Crime 3–4 (1967).

Although it had become a national problem, federal law enforcement officials were rarely able to prosecute loan sharking by organized crime. Their principal enforcement weapon was the Hobbs Act, 18 U.S.C. § 1951, which proscribed extortion affecting interstate commerce. But its definition of extortion in § 1951(b)(2) required proof that repayment of the loan was "induced by wrongful use of actual or threatened force, violence, or fear * * * ", and loan sharks connected with organized crime rarely used force, or even made explicit threats to do so, because they found it unnecessary. A loan shark's victim knew all too well that if he did not pay, a likely result would be bodily harm to him or his family. *See Impact of Crime on Small Business—1968: Hearings Before the Senate Select Committee on Small Business,* 90th Cong., 2d Sess. 31–32 (1968) (testimony of Henry E. Petersen, Chief of Organized Crime and Racketeering Section, Department of Justice). Thus, the absence of a prohibition against implicit as well as explicit threats made the Hobbs Act ineffective against organized crime loan sharks. *See* 114 Cong.Rec. 14105 (1968) (Report of House Republican Task Force on Crime, introduced by Rep. Ford).

In addition, federal efforts to prosecute members of organized crime had been hampered by victims' reluctance to testify against the loan sharks. There were two reasons for that reluctance. First, victims knew all too well that testifying against a member of organized crime could be suicidal. *See* Note, *Loan Sharking: The Untouched Domain of Organized Crime,* 5 Colum.J. of Law & Soc.Prob. 91, 95–96 (1969). Second, victims were often forced to commit crimes themselves, in order to pay the astronomical interest rates charged by the loan shark. Note, *supra,* at 97. In light of these concerns over organized crime loan sharking the extortionate credit transactions statute began to evolve.

In December of 1967 Representative Poff introduced a bill to amend the Hobbs Act by specifically including loan sharking among its prohibitions. That bill was immediately sent to the judiciary committee, 113 Cong.Rec. 35919 (1967), but it died there without hearings or other consideration. 114 Cong.Rec. 1606 (1968) (remarks of Rep. Patman).

On January 31, 1968, Representative Poff introduced a loan shark amendment to the consumer credit protection bill then being considered in the house. Patterned after the Hobbs Act, that amendment ultimately served as the basis for the present extortionate credit transactions statute. *Id.* at 1607. It proposed federal prohibitions against two types of loan shark activity. First, the bill made it a federal crime to lend money at a rate of interest in excess of that permitted in the state where the loan was made. Second, the bill provided:

> Whoever knowingly participates in any way in a wrongful use of actual or threatened force, violence, or fear in connection with a loan or forbearance in violation of subsections (1) and (2) of this section * * * shall be fined not more than $10,000 or imprisoned not more than 20–25 years, or both.

*Id.* at 1606.

Some legislators, however, doubted that loan sharking should be prosecuted under

federal criminal law and challenged Representative Poff's proposal to federalize the state crime of usury. They pointed out that in addition to inconsistent prosecutions that would result from applying the various state laws on usury, many states had no usury laws at all. *Id.* at 1607–1610 (remarks of Reps. Patman and Eckhardt).

Representative McDade then introduced an alternative amendment which provided, in part,

> Whoever knowingly participates in any way in a wrongful use, or the express or implicit threat, of violence or other harm to person, reputation, or property directly or indirectly to bring about the satisfaction or discharge * * * [of a usurious loan] shall be fined not more than $10,000 or imprisoned not more than 25 years, or both.

*Id.* at 1610.

At that point, Representative Patman, a sponsor of the consumer credit protection bill, agreed to take both the Poff and McDade amendments into the senate-house conference on the bill. He stated, however, that the "very loose" language of the proposed amendments needed to be "tightened up" in conference. *Id.* at 1608.

On May 22, 1968, the consumer credit protection bill emerged from the conference committee with its loan sharking provisions altered substantially. The conferees had deleted the language making violation of state usury laws a federal crime, and the conference report accompanying the final bill explicitly stated that the bill

> is not, and is not intended to be, a Federal usury law, nor does it have anything to do with interest rates as such. It is, rather, a deliberate legislative attack on the economic foundations of organized crime.

*Id.* at 14384 (Conf.Rep. No. 1397, 90th Cong., 2d Sess.), *reprinted in* 1968 U.S. Code Cong. & Ad.News, 1962, 2029.

The "other criminal means" language, which is the focus of this appeal, had not been included in either the Poff or McDade amendments; it was added by the conferees, but without any explanation in the conference report. The floor debate on the conference bill focused primarily on the "violence" aspect of extortionate credit. *See* 114 Cong.Rec. at 14385 (remarks of Rep. Widnall) ("loan shark interest rates * * * can be charged and collected only because the threat of violence to person, property, or the reputation of the debtor is implicit in virtually all loan shark arrangements."); *id.* at 14390 (remarks of Rep. Poff) ("When direct evidence of violence * * * is readily available, such evidence is all that is required to prove the crime [of extortionate extension of credit]."); *id.* at 14396 (remarks of Rep. Railsback).

However, the debate also addressed the fact that the statute, as drafted, would promote the prosecution of loan sharks who forced their victims into committing crimes to repay the loans. *See id.* at 14396 (remarks of Rep. Mathias); *id.* (remarks of Rep. Railsback); *id.* at 14395 (remarks of Rep. King) ("the modern Wall Street loan shark loans money in order to exploit the services of the borrower"; the "price of the [loan shark's] generosity is the clerk's agreement to arrange a sale of stolen securities"). Finally, in the only discussion of "other criminal means", Representative McDade, who had sponsored one of the two original loan sharking amendments, stated:

> I want to make it clear that the term *"other criminal means"* as used in this statute *is intended by its authors* to have a liberal construction in order that we can *take care of the situations which involve forcing other people to do criminal activity under threat of collection of debt.* The use of force, express or implied, is not the sole test of an extortionate extension of credit. This is an important part of the statute.

*Id.* at 14391 (emphasis added). This is the sole direct clue to what congress meant by "other criminal means", and it is simply inadequate to justify the sweeping interpretation which the government would now, fifteen years later and for the first time, attribute to the phrase.

Our review of the legislative history convinces us that congress was concerned pri-

marily with the use of actual and threatened violence by members of organized crime engaged in loan sharking and that it did not intend to authorize a federal 20 year punishment for every creditor who violated some other state or federal criminal statute in the process of making or collecting a usurious loan. In our view, the term "other criminal means" was meant to supplement the context of "violence" so as to punish those who forced their non-paying victims into committing crimes. We do not now attempt to ascertain the precise limits of the statute, for it is sufficient to conclude that Pacione's activities in preparing and threatening to record a deed and mortgage that recited false considerations, and in actually recording the deed, are beyond those limits and therefore not included within the activities congress meant to proscribe. *Cf. Perez v. United States,* 402 U.S. 146, 152–53, 91 S.Ct. 1357, 1360–61, 28 L.Ed.2d 686 (1971).

Our narrow interpretation is consistent with that previously given the statute in this and other courts. Certainly, the emphasis of the vast majority of prosecutions instituted under the statute is on the use of, or explicit or implicit threat to use, violence to instill fear in the victim. *E.g., Perez v. United States,* 402 U.S. at 148, 91 S.Ct. at 1358; *United States v. Bufalino,* 576 F.2d 446, 448–52 (2d Cir.), *cert. denied,* 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978); *United States v. Gambino,* 566 F.2d 414, 416–17 (2d Cir.1977) *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978); *United States v. Sears,* 544 F.2d 585, 586–87 (2d Cir.1976); *United States v. Natale,* 526 F.2d 1160, 1165–66 (2d Cir. 1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976); *see also United States v. DeVincent,* 546 F.2d 452, 456–57 (1st Cir.1976), *cert. denied,* 431 U.S. 903, 97 S.Ct. 1694, 52 L.Ed.2d 387 (1977); *United States v. Benedetto,* 558 F.2d 171, 174 (3rd Cir.1977); *United States v. Nakaladski,* 481 F.2d 289, 293–95 (5th Cir.), *cert. denied,* 414 U.S. 1064, 94 S.Ct. 570, 38 L.Ed.2d 469 (1973); *United States v. Marchesani,* 457 F.2d 1291, 1293 (6th Cir.1972); *United States v. Annoreno,* 460 F.2d 1303,

1306–09 (7th Cir.), *cert. denied,* 409 U.S. 852, 93 S.Ct. 64, 34 L.Ed.2d 95 (1972); *United States v. Dennis,* 625 F.2d 782, 790 (8th Cir.1980); *United States v. Andrino,* 501 F.2d 1373, 1375–76 (9th Cir.1974). *See generally* Goldstock & Coenen, *Controlling the Contemporary Loanshark: The Law of Illicit Lending and the Problem of Witness Fear,* 65 Cornell L.Rev. 127, 167–80 (1980). In *United States v. Sears,* 544 F.2d 585, 587 (2d Cir.1976), we approved the following charge given by the district court:

> In the first place, you recall the statute says that extortionate means is defined as follows: Any means which involves the use or an express or implicit threat or use of violence or other criminal means to cause harm to the person, reputation or property of any individual. So that is what we mean by extortionate means. Extortion as far as this statute is concerned includes any act or statement which constitutes a threat if it instills fear in the person to whom they [sic] are directed or are reasonably calculated to do so in light of the surrounding circumstances.

Finally, in *United States v. Natale,* 526 F.2d 1160 (2d Cir.1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976), this court noted that the statute was designed to restrain "the effort of usurious money lenders, or 'loan sharks,' to seek *extra-legal methods* of enforcing their unconscionable agreements". *Id.* at 1165 (emphasis added). But here, Pacione did not seek "extra legal methods" to enforce his unconscionable agreement; on the contrary, he attempted to use the legal system, albeit with false documents, to enforce a usurious rate of interest that would have enabled his debtor to assert legal defenses. We do not believe that attempted enforcement of usurious loans within the legal system was the type of activity congress intended to make a federal crime. We assume that congress expected the states' legal systems to ferret out and defeat such reprehensible methods as are described in the indictment and to deal with

them, and their underlying schemes, in an appropriate manner. Absent threats of violence or other extra-legal methods to enforce such loans, congress did not intend to add the federal proscriptions of the extortionate credit transactions statute to those already existing at the state level.

### III.

The order of the district court is affirmed.