**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Anthony. PETROV,
Defendant-Appellant.**

**No. 954, Docket 83–1401.**

United States Court of Appeals,
Second Circuit.

Argued March 23, 1984.

Decided Oct. 5, 1984.

Jon O. Newman, Circuit Judge, filed separate opinion dissenting in part.

Lumbard, Circuit Judge, filed opinion concurring in part and dissenting in part.

William C. Bryson, Dept. of Justice, Washington, D.C. (Frederick J. Scullin, Jr., U.S. Atty., N.D.N.Y., Gregory A. West, Gary L. Sharpe, Asst. U.S. Attys., Syracuse, N.Y., of counsel), for plaintiff-appellee.

Herald P. Fahringer, New York City (Lipsitz, Green, Fahringer, Roll, Schuller & James, New York City, of counsel, Diarmuid White, Legal Asst., New York City, on brief), for defendant-appellant.

Before LUMBARD, NEWMAN, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge.

Anthony Petrov appeals from a judgment of the United States District Court for the Northern District of New York, Howard G. Munson, *Chief Judge*, convicting him, after a jury trial, of one count of conspiracy in violation of 18 U.S.C. § 371 and ten counts of mailing obscene material in violation of 18 U.S.C. § 1461. For the reasons set forth below, and in the opinions of Judge Lumbard and Newman, counts 1, 2, 3, 5 and 6 are reversed and remanded for a new trial, and counts 7, 8, 9, 10, 11 and 12 are affirmed. Count 4 was dismissed by the trial court.

## I. BACKGROUND

Petrov is a commercial film processor. Through his mail order business, Spectra Photo, located in North Syracuse, New York, he develops and prints photographs from exposed film, negatives, and prints mailed to him by customers. For this business and for his related retail photo processing business, operated from the same quarters under the name Crystal Photo, defendant had 22 full-time employees and several part-time employees. During 1982 and 1983 his combined operations processed approximately four million photographs for people all over the country. Much of Spectra's business was generated through advertisements in numerous "adult" magazines for a "confidential" and "uncensored" photo processing service.

Petrov's prosecution in this case is based primarily on a large number of allegedly obscene photographs that Spectra processed for, and mailed back to, eleven different customers. These processed orders formed the basis for the eleven substantive counts of the twelve count indictment.

After a six-week trial, the jury acquitted Petrov's two employee-codefendants, but found Petrov guilty of mailing obscene material on ten of the eleven substantive counts brought under 18 U.S.C. § 1461. The jury also found Petrov guilty of a conspiracy to violate § 1461 (mailing obscene material) and 18 U.S.C. § 2251 (sexual exploitation of children). Defendant was given concurrent, split sentences of six months' imprisonment, followed by three years' probation. In addition, he was fined $10,000 on count 1 and $5,000 on each of the other ten counts, for a total fine of $60,000.

The significant issues before us on appeal are whether the activities of a photo processor such as Petrov violate 18 U.S.C. § 1461, which prohibits the mailing of obscene matter, and also 18 U.S.C. § 2251, which prohibits the sexual exploitation of children; whether Petrov was prejudiced by the trial court's submission of the issue of sexual exploitation of children to the jury; whether there was sufficient evidence to establish that the photographs admitted on counts 7 through 12 appealed to the prurient interest of a clearly defined deviant group; and whether the trial court unduly restricted Petrov's proof of the community standards for obscenity. Further issues raised in the briefs have been considered and rejected as not meriting comment. Relevant facts will be discussed as needed.

## II. SECTION 1461

■ With great force, Judge Newman argues in dissent that the entire indictment should be dismissed because, in enacting 18 U.S.C. § 1461, Congress did not intend to criminalize the activities of commercial photo processors such as Petrov. Yet § 1461, as Judge Newman acknowledges, is broadly worded. It reaches "whoever" knowingly mails obscene matter. This description includes Petrov, who processed obscene photographs and, knowing that the material was obscene, mailed the completed orders back to his customers. *See United States v. Reidel*, 402 U.S. 351, 356, 91 S.Ct. 1410, 1412, 28 L.Ed.2d 813 (1971). If congress did not intend to subject photo processors to criminal liability under § 1461, it would have written § 1461 to reflect that intent, either by narrowing its scope with limiting language or by carving out a specific exception for ·photo processors. Not only has congress done neither of these things, but the Supreme Court has consistently construed the language of § 1461 broadly. *See, e.g., Reidel*, 402 U.S. at 355–56, 91 S.Ct. at 1412–1413; *cf. United States v. Orito*, 413 U.S. 139, 141–44, 93 S.Ct. 2674, 2676–2678, 37 L.Ed.2d 513 (1973) (§ 1462). While we might agree with Judge Newman's concern over the wisdom of applying this statute to the activities of commercial photo processors, we think it is for congress, and not this court, to create exceptions to the statute's clearly expressed, broad coverage. We hold, therefore, that the activities in question here fall under the purview of § 1461.

## III. SECTION 2251

■ Petrov contends that his entire trial was unfairly prejudiced because the government injected the highly volatile issue of child pornography into the proceedings through its charge that defendant conspired not only to mail obscene materials in violation of § 1461, but also to engage in the sexual exploitation of minors in violation of § 2251. This claim consists of two issues: (a) Was Petrov properly charged with conspiracy to violate § 2251? (b) If not, was Petrov unfairly prejudiced by the trial court's denial of his motions to strike the alleged violation of § 2251?

Count 1 of the indictment charged a conspiracy among Petrov, his two codefendants, and others, to commit two offenses against the United States: to mail obscene matter in violation of 18 U.S.C. § 1461, and

to sexually exploit minors in violation of 18 U.S.C. § 2251. Petrov does not challenge the legal sufficiency of the § 1461 purpose of the conspiracy. He does challenge, however, the § 2251 purpose, claiming that his activities as a commercial photo processor, the only conduct charged against him in this case, cannot be prosecuted under § 2251.

Section 2251(a) provides:

Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, any sexually explicit conduct for the purpose of producing any visual or print medium depicting such conduct, shall be punished as provided under subsection (c), if such person knows or has reason to know that such visual or print medium will be transported in interstate or foreign commerce or mailed, or if such visual or print medium has actually been transported in interstate or foreign commerce or mailed.

Congress enacted § 2251(a) as part of the Protection of Children Against Sexual Exploitation Act of 1977, Pub.L. No. 95–225, § 2(a), 92 Stat. 7, 8 (1978) (codified at 18 U.S.C. §§ 2251–53), whose purpose was to combat a proliferation of child pornography throughout the country. S.Rep. No. 438, 95th Cong., 2d Sess. 5–11 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad. News 40, 42–48. Congress believed this legislation was necessary to deal with the commercial exploitation of sexual activity involving children because then-existing federal law focused "almost exclusively on the sale, distribution and importation of obscene materials" and did not "directly address the abuse of children inherent in their participation in the production of such materials." *Id.* at 15, 1978 U.S.Code Cong. & Ad.News at 53.

Indisputably, Petrov had no direct involvement in using, employing, or persuading minors to engage in any explicit sexual conduct depicted in any of the photographs Spectra developed. Instead, the government argues that because processing film is an integral part of the production of child pornography, Petrov's position is not materially distinguishable from that of the person who actually induces the minor to be photographed. Consequently, the government argues, by advertising his availability to process such "confidential" photographs, and by repeatedly doing so, Petrov has conspired to violate § 2251. We disagree.

The plain language of § 2251(a) defeats the government's argument. Its proscribed acts are those of someone who "employs, uses, persuades, induces, entices or coerces" a minor to engage in sexually explicit conduct, and even those acts are not covered unless done "for the purpose of producing any visual or print medium depicting such conduct". Section 2251(a) does not purport to proscribe the entire process that creates child pornography; instead, it is narrowly drawn to reach only those people who deal with children directly. Absent some indication that Petrov's conduct aided his customers in procuring the participation of children, we cannot sustain the government's theory.

The fact that some of Petrov's customers may have been repeat customers does not alter this result. There is no evidence that any of the children were enticed or induced after Petrov processed photographs for these customers, or even that he knew when those acts occurred. In fact, since most of Spectra's customers sent in previously developed prints, or negatives of photographs already developed, the connection between Petrov and the children's sexual conduct is even more attenuated than if Spectra had developed and printed them from exposed film. In short, the evidence was insufficient to demonstrate any implicit or explicit agreement by Petrov that contemplated the use of minors for creating pornographic pictures.

Moreover, Pub.L. No. 95–225 also includes § 2252, entitled "Certain Activities Relating to Material Involving the Sexual Exploitation of Minors", which, in distinction to § 2251's prohibition of the actual use of minors in photographs depicting sex-

ually explicit conduct, prohibits the transportation or sale of obscene materials involving children. Specifically, § 2252 prohibits the transporting, shipping, mailing, and sale of "any obscene visual or print medium" whose production "involves the use of a minor engaging in sexually explicit conduct" or which depicts such conduct.

On its face, § 2252 appears to strike closer to the facts of this case than § 2251, and Petrov's activity arguably might fall under the language of this section. Yet, the legislative history of § 2252 indicates that congress refused to include any reference to photo processors, despite a specific suggestion to do so by the Department of Justice.

In response to a request from Senator Eastland, chairman of the senate judiciary committee, the justice department issued an opinion on S. 1011, the initial bill introduced on the subject of child pornography. Among other things, the justice department observed:

> [S]ince we view the bill as an attempt to deal with the commercial exploitation of sexual activity involving children, subsection 2252(a)(2) should be amended to include any individual who manufactures, reproduces or duplicates the subject films or photographs with the requisite intent as well as those who receive or sell such films or photographs. *This will enable the bill to cover film processing laboratories and others who are instrumental in the distribution process and who are aware of the nature of the material and the use of the mails or facilities of interstate or foreign commerce.*

S.Rep. No. 438 at 28, 1978 U.S.Code Cong. & Ad.News at 63 (emphasis added).

This failure to include such an amendment in the final bill takes on added significance in light of the fact that the judiciary committee eventually decided not to report out S. 1011, largely because of the justice department's position on the entire bill. *Id.* at 11, 1978 U.S.Code Cong. & Ad.News at 48. Instead, a new bill, S. 1585, was drafted "so as to correct a number of the faults

that the Justice Department had found with S. 1011." *Id.* at 13–14, 1978 U.S.Code Cong. & Ad.News at 51. Although the new bill incorporated many of the changes suggested by the justice department, it conspicuously omitted any reference to "photoprocessors" or anyone else "instrumental in the distribution process". From the foregoing history and the fact that S. 1585 was passed by the senate and, in substance, enacted into law as Pub.L. No. 95–225, we infer that congress intended to exclude photo processors from § 2252.

Although the justice department's suggestion pertained specifically to § 2252 and not § 2251, we think the fact that congress included no reference whatsoever in its final version of Pub.L. No. 95–225 to anyone who "manufactures, reproduces or duplicates film or photographs" demonstrates its intent not to include such persons under either § 2251 or § 2252.

Despite the dictum of the Seventh Circuit in *United States v. Langford*, 688 F.2d 1088 (7th Cir.1982), *cert. denied*, 461 U.S. 959, 103 S.Ct. 2433, 77 L.Ed.2d 1319 (1983), relied on by the government and the district court, that "Congress clearly intended that § 2251 *et seq.* eradicate the *entire commercial chain* involved in production, distribution and sale of child pornography", 688 F.2d at 1097 (emphasis added), we think the legislative history of the act belies any explicit or implicit intention to apply this statute to photo processors such as Petrov.

Finally, our interpretation of the statute was somewhat strengthened by congress itself, which only this year amended § 2252 by adding to its prohibitions conduct that is arguably aimed at mail-order photo processors, among others. To those who were already subject to the sanctions of § 2252, congress added anyone who "knowingly *reproduces any visual depiction* [of a minor engaged in explicitly sexual conduct] *for distribution* in interstate or foreign commerce or *through the mails*". Child Protection Act of 1984, Pub.L. No. 98–292, § 4, 98 Stat. 204 (1984) (emphasis added). On its face this language would seem to cover

photo processors, although the house report accompanying the bill explained that this "reproduction offense" is aimed at "the producer who pirates photos from other publications or who purchases photos for reproduction." H.R.Rep. No. 536, 98th Cong., 1st Sess. 3 (1983), *reprinted in* 1984 U.S.Code Cong. & Ad.News 492, 494. We thus have a possible conflict as to whether congress intended to limit the scope of § 2252 to the specific type of "producer" described in the legislative history, or whether it intended the coverage of § 2252 to extend to photo processors, as its language seems to imply. Whatever the resolution of this issue, which is not before us and which we do not attempt to resolve, the amendment of § 2252 to include "producers" underscores the fact that, prior to this amendment, § 2251 "seem[ed] to require that a producer also be directly involved in inducing the child to pose for the photography in question before violating the Act." H.R.Rep. No. 536 at 3, 1984 U.S.Code Cong. & Ad.News at 494.

We conclude, therefore, that the trial court erred in submitting to the jury the issue of whether Petrov conspired to sexually exploit children, because his activities as a photo processor do not fall within the proscriptions of § 2251. That brings us to the question of whether Petrov was unfairly prejudiced by the trial court's handling of the issue. We conclude that he was prejudiced, not only as to the alternative basis for the conspiracy count (count 1), alleging conspiracy to violate § 1461, but also as to four of the substantive violations (counts 2, 3, 5, and 6), in which the allegedly obscene material sent were photographs of children.

The evidence introduced on count 1 is more inflammatory than that introduced in counts 2, 3, 5, and 6. The photographs introduced on counts 2, 3, 5, and 6 are relatively innocuous pictures of nude boys, some, if not all, of whom are apparently under the age of 16. In each count most of the photographs are of one person. With one exception, none depicts explicit sexual activity, except for a few where a boy is shown fondling his genitals. Among the

photographs introduced on count 1, however, are some which do depict sexually explicit conduct, primarily oral intercourse, involving children. The spillover prejudice from the count 1 photographs was greatly compounded when the trial court, at one point in its charge on the conspiracy count, equated sexual exploitation of children with mailing obscene photographs. In effect, the trial court instructed the jury that the substantive counts of the indictment involved sexual exploitation of children, whereas, in fact, they charged only mailing obscene matter. This prejudice was further augmented by a reference in the prosecutor's summation to counts 2 through 6 as dealing "with obscene material that's involving kids". In essence, without the spillover effect of the inflammatory photographs introduced on count 1, coupled with the court's instruction and the prosecutor's references to child pornography, we cannot be confident that the jury would have found the photographs introduced on the substantive counts to be obscene.

In sum, we think that the trial court's handling of the § 2251 issue, when viewed in the light of its instructions, the evidence presented, and the government's summation, requires reversal of Petrov's convictions and a new trial on count 1 (as it relates to § 1461), and counts 2, 3, 5, and 6. The spillover prejudice from count 1, did not, however, affect counts 7 through 12 since the photographs in those counts involved adults and were clearly distinguishable in content and context from any possible sexual exploitation of children. There are other issues with respect to those counts, however, which do require our attention.

## IV. DEVIANT GROUPS

Counts 7 through 12 all alleged that Petrov mailed obscene materials. In counts 8, 10, 11, and 12 the allegedly obscene materials were photographs depicting bondage, torture, and body mutilation. Counts 7 and 9 involved photographs depicting sexual activity between either men

or women and various animals. Petrov contends that the photographs in all six of these counts are so disgusting as to be incapable of appealing to the prurient interest of the average person under the contemporary community standards test for obscenity, and that the government failed to present the expert testimony necessary to establish that the photographs would appeal to the prurient interest of a clearly defined deviant group. The government contends that expert testimony was unnecessary on counts 7 and 9, and that it was supplied on counts 8, 10, 11, and 12 through cross-examination of defendant's expert witnesses.

■ In the typical obscenity case, one of the essential elements to be established is that "to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to the prurient interest." *Roth v. United States*, 354 U.S. 476, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498 (1957); *see also Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973). However, material appealing to atypical sexual proclivities may be found "obscene" only when its dominant theme appeals to the prurient interest of members of a "clearly defined deviant sexual group". *Mishkin v. New York*, 383 U.S. 502, 508, 86 S.Ct. 958, 963, 16 L.Ed.2d 56 (1966).

This circuit, in *United States v. Klaw*, 350 F.2d 155 (2d Cir.1965), held that where the prurient interest is of a "deviant segment of society", the government must not only identify the deviant group, but must also establish that the material in question appeals to that group's prurient interest. Both facts are generally established through the use of expert testimony. *Id.* at 166–67; *see also Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 56 n. 6, 93 S.Ct. 2628, 2634, n. 6, 37 L.Ed.2d 446 (1973) (Supreme Court reserves judgment on the "extreme case", where the materials "are directed at such a bizarre deviant group that the experience of the trier of fact would be plainly inadequate to judge

whether the material appeals to the prurient interest", *citing Mishkin* and *Klaw*).

As applied to the case before us, this issue pertains only to counts 7 through 12, because counts 2, 3, 5, and 6 involve photographs of nude, mostly underage, males, on which the trier of fact needs no expert advice to determine the issues of prurient appeal and offensiveness to contemporary community standards. *United States v. Wild*, 422 F.2d 34, 35–36 (2d Cir.1969), *cert. denied*, 402 U.S. 986, 91 S.Ct. 1644, 29 L.Ed.2d 152 (1971).

### A. Bondage Counts.

■ The material in counts 8, 10, 11, and 12, like that in *Klaw*, is of the "bondage" genre. *See Wild*, 422 F.2d at 35 n. 1. These photographs depict nude men and women bound with leather straps and chains, subject to various types of sexual abuse, (counts 8 and 11), as well as genital mutilation and torture (counts 10 and 12). Since such bizarre activity is not directed at the average person, nor does it appeal to the average person's prurient interest, *see Klaw*, 350 F.2d at 167, the government was required to establish the existence of a deviant group to whom such material appeals, and that the material at issue would appeal to such a group. *Id.*

The government contends that it presented sufficient evidence for these purposes through its cross-examination of defendant's expert, Dr. Clive M. Davis. On direct, Dr. Davis had testified that the photographs of bondage, genital mutilation, and torture, which were the subject of counts 8, 10, 11 and 12, did not appeal to the prurient interest of the average person in that "the average person would be uninterested in sexually and unaroused sexually by that material." Dr. Davis acknowledged, however, that the American Scientific Association recognizes sexual sadism as a psychosexual dysfunction, and that the materials in evidence dealing with bondage and sadomasochistic activity would be sexually interesting and result in sexual arousal "[f]or some small minority of individuals viewing that material," even though, taken as a

whole, they would not have such an appeal to the average person.

While Dr. Davis, himself, had doubts as to whether activity between consenting adults would constitute "deviance", he conceded that respectable expert opinion in the field, including the manual of the American Scientific Association, classifies bondage, torture, and mutilation activities as deviant even when consented to. We think that the evidence on these issues, developed through Dr. Davis's cross-examination, was sufficient to satisfy the requirements of *Klaw*, and to warrant submission of counts 8, 10, 11, and 12 to the jury. The verdicts of guilty on these counts, therefore, must be affirmed.

### B. *Bestiality Counts.*

■ My colleagues have voted to affirm counts 7 and 9, whose photographs depict nude men and women engaging in various sexual acts with a variety of animals. There is no doubt about their offensiveness to contemporary community standards. But contrary to the position of Judge Lumbard, *infra* at 836, concurred in by Judge Newman, *infra* at 832, I think that these pictures are so bizarre that the jury could not have found any appeal to prurient interest simply by examining the photographs. Under *Klaw*, therefore, I believe that expert testimony was necessary to establish that link to obscenity.

On cross-examination of defendant's expert, while the government did establish the existence of a deviant sexual group which suffers from a sexual dysfunction known as zoophilia, the government did not establish that the particular pictures in evidence in counts 7 and 9 would appeal to the prurient interest of a zoophiliac. Absent such evidence, I would conclude that the proof on counts 7 and 9 was insufficient and that these counts should be dismissed. I therefore dissent from my colleagues' affirmance of these counts.

### V. EVIDENCE OF COMMUNITY STANDARDS

Although five counts are being remanded for a new trial, we have no way of knowing whether the new trial will actually occur. Since there may be a new trial, however, and since the issue may arise in other cases, we think it appropriate to comment on the district court's handling of the "comparable" evidence offered by defendant on the issue of community standards by which the obscenity of the photographs in counts 2, 3, 5, and 6 is to be judged.

■ A key issue in any obscenity case is the degree of community acceptance or toleration of materials similar to those at issue. *See United States v. Pinkus*, 579 F.2d 1174, 1175 (9th Cir.), *cert. dismissed*, 439 U.S. 999, 99 S.Ct. 605, 58 L.Ed.2d 674 (1978); *United States v. Womack*, 509 F.2d 368, 376–78 (D.C.Cir.1974), *cert. denied*, 422 U.S. 1022, 95 S.Ct. 2644, 45 L.Ed.2d 681 (1975). To establish that some or all of the photographs did not offend community standards, Petrov called a private investigator who testified that he had visited a number of bookstores and newsstands in Syracuse and other cities in the Northern District of New York, where he purchased various magazines and books. In opposing the admission of defendant's comparable materials, the government contended that even assuming their comparability, their availability in the community "does not automatically make them admissible as tending to prove the nonobscenity of the materials which the defendant is charged with circulating." *Hamling v. United States*, 418 U.S. 87, 125, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974); *see also United States v. Manarite*, 448 F.2d 583, 593 (2d Cir.), *cert. denied*, 404 U.S. 947, 92 S.Ct. 298, 30 L.Ed.2d 264 (1971) ("[m]ere availability of similar materials by itself means nothing more than other persons are engaged in similar activities"). Thus, in addition to availability, the government argued, it must be shown that the proffered materials enjoy "a reasonable degree of community acceptance", before they will be admitted. *Id.* The court sustained the government's objection to most of the material, although it admitted as "comparable" items a series of bondage and genital mutilation photographs from two magazines, "Penthouse"

and "Bounty". The court also admitted photographs of the bookstores and outlets where the investigator had purchased these materials.

We recognize the difficulties inherent in attempting to prove a fact as elusive as a community standard; on the other hand, we are uncomfortable with the circularity of the approach suggested by the government, that, in order for the defendant to place comparable photographs in evidence for the purpose of establishing community acceptance, he must first establish the community acceptance. We are also aware of the practical difficulties that would be created by a rule that admitted all comparable materials on the theory that if they were found in the community they were some evidence of community acceptability and community standards.

■ We think a solution is adequately provided for in the Federal Rules of Evidence, which were not in effect when both *Hamling* and *Manarite* were decided. Comparable material that is available in the community can be viewed as relevant under Rule 401; but whether it should be admitted in a particular trial is a delicate question to be determined by the balancing process of Rule 403, which requires the trial judge to determine whether the probative value of the particular offer is substantially outweighed by one or more of a variety of considerations, including confusion of the issues, misleading the jury, waste of time, or needless presentation of cumulative evidence. By judicious application of Rule 403, a trial judge can afford the defendant in an obscenity case a fair opportunity to prove that the community displays a reasonable degree of acceptance of comparable material, without needlessly prolonging the trial with cumulative evidence of minimal probative value.

When the district court ruled in this case that some of Petrov's proffered comparable evidence was admissible and some was not, it gave no explanation for its ruling. Effective appellate review of such an issue requires the trial court to explain its decision. This is particularly so when the trial

court decides an evidentiary question under Rule 403, which requires it to strike a balance between probative value and the competing considerations. If there is a retrial, and if "comparable" evidence is again offered by Petrov, we expect the trial court to analyze the problem in light of all the circumstances presented at the new trial, and after applying Rule 403, to make clear on the record the reasons for its rulings. *See Pinkus,* 579 F.2d at 1175.

## VI. CONCLUSION

Counts 7, 8, 9, 10, 11, and 12 are affirmed. Counts 1, 2, 3, 5, and 6 are reversed and remanded for a new trial. In view of our reversal of the "child" counts of the indictment, we vacate the sentences on the "adult" counts, counts 7–12, in order to give the district court an opportunity to reevaluate the sentences in this changed light. We therefore remand for resentencing on those counts. *See United States v. Hines,* 256 F.2d 561, 563 (2d Cir.1958).

JON O. NEWMAN, Circuit Judge, dissenting in part.

I disagree with the majority's view that the statute punishing mailing of obscene materials, 18 U.S.C. § 1461 (1982), applies to a photo processor. Until today no reported decision has so construed the statute. I do not believe that Congress intended section 1461 to criminalize the conduct of photo processors who receive film containing obscene pictures taken by members of the public, develop negatives from the film, print photographs, and mail the finished prints back to the senders. Construing the statute to cover photo processors not only distorts a carefully constructed congressional scheme to provide circumscribed restraints on those who print or reproduce certain sexually explicit materials, it also obliges all photo processors to become the censors of the nation's millions of photographers.

The statute is broadly worded. "Whoever" knowingly mails non-mailable matter, including obscene photos, is covered by its literal terms. *Id.* But though the words

of a statute are the starting point for construction, they are not necessarily the end of the exercise. Nearly a century ago the Supreme Court confronted a statute that provided criminal penalties for importing an alien to perform "labor or service of any kind." Act of February 26, 1885, ch. 164, 23 Stat. 332, *successor statute repealed by* Immigration and Nationality Act, § 403(a)(2), 66 Stat. 163, 279 (1952). The Government had sought to apply the statute to a church that had imported an alien minister. Not only did the statute literally apply, but the argument for its application to ministers was strengthened by the statute's specific exclusion of various other occupations. Nevertheless, the Court unanimously construed the statute to be inapplicable to ministers, concluding that Congress most likely had not intended such coverage. *Church of the Holy Trinity v. United States*, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892).

Only recently, our Court ruled that an all-inclusive term of a criminal statute should be somewhat narrowly construed to avoid results most likely not intended by Congress. *See, e.g., United States v. Pacione,* 738 F.2d 567 (2d Cir.1984) ("other criminal means," as used in extortionate credit statute, 18 U.S.C. § 891(6) (1982), does not mean *all* other criminal means). Sometimes, of course, we have construed a criminal statute literally, *see, e.g., United States v. Weisman,* 624 F.2d 1118, 1123–24 (2d Cir.) ("any offense" in RICO definitional provision, 18 U.S.C. § 1961(1)(D) (1982) includes conspiracy offense), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91

(1980). "There is no automatically 'right' way to decide" whether or not to apply the literal terms of a statute. *United States v. Perdue Farms, Inc.,* 680 F.2d 277, 286 (2d Cir.1982) (Newman, J., concurring). We must examine the particular statute, related statutes, and the consequences of a literal interpretation.

The obscene mail statute derives from the Comstock Act, Act of June 8, 1872, R.S. § 3893, ch. 335, § 148, 17 Stat. 283 (1872). In 1872 no one was mailing film to a photo processor. The "film" of that era was a glass plate that had to be developed on the scene immediately by the photographer.[1] Not until after the popularity of George Eastman's box camera led to the development in 1895 of film that could be loaded in the light did the industry that we know as photo processing come into existence.[2] No doubt the later Congresses that reenacted the more recent predecessors of section 1461 were aware that the mails were being used by photo processors, but there is no indication that Congress ever considered the application of this statute to such businesses.

More significantly, Congress has given specific consideration to the printing and reproduction of sexually explicit photographs. In 1970, Congress enacted a statute making it a crime to "print, reproduce, or manufacture" any "sexually related mail matter." Pub.L. No. 91–375, § 6(j)(37)(A), 84 Stat. 781 (1970) (codified at 18 U.S.C. § 1737 (1982)). That statute, however, is carefully drawn in a way that does not place at risk every photo processor of a photograph later determined to be obscene.

---

**1.** The "standard method of making photographic negatives" in the 1870's was the wet collodion process. C. Mees, *From Dry Plates to Ektachrome Film* 8 (1961).

> The worker of the wet collodion process had to make his own plates at the time when he wanted to take a picture. He would clean a piece of glass and coat it with collodion in which chemicals were dissolved and then put the plate in a bath of nitrate of silver, which formed silver iodide in the collodion film and made it sensitive to light. The plate had to be exposed in the camera while wet, and the developer had to be poured over it immediately after exposure. It was then fixed and

> dried. To carry out these operations, a landscape photographer had to carry with him a folding tent which he could set up in the open air.

*Id.* at 8.

**2.** The introduction in 1888 of the first Kodak camera made photography accessible to the general public. The consumer purchased the camera for $25, took one hundred pictures, and returned the entire unit to the Kodak factory for processing. The product was marketed under the slogan, "You press the button, we do the rest." C. Mees, *supra,* at 15–16.

First, the statute defines "sexually related mail matter" as material within the scope of section 3008(a) or 3010(d) of Title 39, which cover only sexually explicit *advertisements*. Second, the statute punishes only those who print or reproduce such materials "intending or knowing that such matter will be deposited for mailing or delivery by mail in violation of section 3008 or 3010 of title 39" or of regulations issued thereunder. 18 U.S.C. § 1737(a). Sections 3008 and 3010 of Title 39 prohibit the mailing of certain materials to those who have notified the postal authorities that they do not wish to receive such materials. Section 1737 of Title 18 thus imposes no obligation on a photo processor to decide whether or not a particular photograph is obscene; the statute is violated only by mailing sexually explicit material to unwilling recipients.

Congress next considered photo processors in 1978, when it enacted the Protection of Children Against Sexual Exploitation Act of 1977, Pub.L. No. 95–225, § 2(a), 92 Stat. 7, 8 (codified at 18 U.S.C. § 2251–2253 (1982)). When Congress was considering the provision of that Act prohibiting shipment of obscene material involving children, 18 U.S.C. § 2252, the Justice Department proposed an amendment to include "any individual who manufactures, reproduces or duplicates" films of child pornography, noting that such an amendment would "enable the bill to cover film processing laboratories." S.Rep. No. 95–438, 95th Cong., 2d Sess. 28 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 40, 63. Even though the Senate drafted a new bill, S. 1585, 95th Cong., 2d Sess. (1978), "to correct a number of faults that the Justice Department had found with" the original bill, S.Rep. No. 95–438, *supra*, at 13, 1978 U.S.Code Cong. & Ad.News at 51, the new bill, which in substance became the enacted version, did not adopt the recommendation to include photo processors.

Congress again considered the topic of photo reproduction earlier this year when it enacted the Child Protection Act of 1984, Pub.L. No. 98–292, § 4, 98 Stat. 204. That Act amends 18 U.S.C. § 2252 to include anyone who "knowingly reproduces" child pornography for distribution in interstate commerce or through the mails. Even though the terms of the amended section 2252 are now broad enough to cover photo processors, it is far from clear that Congress intended even this statute to apply to such businesses. The House Report identifies as the object of the new language in section 2252 "the producer who pirates photos from other publications or who purchases photos for reproduction." H.R.Rep. No. 98–536, 98th Cong., 1st Sess. 3 (1983), *reprinted in* 1984 U.S.Code Cong. & Ad. News 492, 494. An ordinary photo processor does neither.

The most compelling reason for not construing section 1461 to apply to photo processors arises from consideration of the consequences of such a construction. Preliminarily, it should be noted that the literal application of the statute to cover "[w]hoever" mails obscene matter would yield a demonstrably unintended result. Under a literal construction, a person would violate the statute if he received in the mail obscene photos that were incorrectly addressed and, after opening the envelope and noticing both the contents and the addressing error, mailed the items back to the sender.

More to the point, it seems most unlikely, for two reasons, that Congress intended the consequences of subjecting photo processors to the coverage of section 1461. First, such businesses are not, by virtue of the task they perform, part of a distribution network that Congress would understandably wish to prevent from using the mails. A photo finisher typically returns his finished prints to the photographer who sent the film to be developed and printed. If the photos are obscene, that photographer is, in a meaningful way, using the mails to send obscene matter; by contrast, the photo processor is using the mails only to return private property to its owner. Of course, the photo processor who prints a large quantity of photos from a negative or an original print facilitates widespread distribution by others, but even activity of that sort is on the borderline of criminal

conduct. *Compare United States v. Falcone,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940) (supplier of sugar and yeast to illegal liquor distillers not guilty of bootlegging conspiracy), *with Direct Sales Co. v. United States,* 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943) (supplier of large quantity of morphine sulphate to physician guilty of narcotics conspiracy). In any event, under the Government's reading of the statute, it applies to the photo processor who mails a single print of an obscene photograph back to the photographer. The statute has no quantitative minimum, and the indictment against Petrov does not specify that the obscene photos were printed in quantity. In fact, the evidence on some of the counts consisted of a single photograph.

Second, and more significantly, application of section 1461 to a photo processor obliges him to make a judgment whether every photograph he prints is obscene. It is one thing to impose that burden, with its consequent risk of criminal conviction, upon the person who initiates the mailing of an obscene photo. *See, e.g., Spillman v. United States,* 413 F.2d 527 (9th Cir.), *cert. denied,* 396 U.S. 930, 90 S.Ct. 265, 24 L.Ed.2d 228 (1969); *United States v. Peller,* 170 F.2d 1006 (2d Cir.1948).[3] It is quite another to impose it upon a photo processor who simply returns to a photographer film that is mailed for developing and printing. In *United States v. Dellapia,* 433 F.2d 1252 (2d Cir.1970), we construed section 1461 to be inapplicable to a person who mailed obscene films upon request to his pen pal. Even if the holding in *Dellapia* has been put in doubt by subsequent Supreme Court decisions, *United States v. Orito,* 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973); *United States v. Twelve 200-Ft. Reels,* 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); *United States v. Reidel,* 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971), it remains as an impor-

tant caution that when government seeks to regulate the private transmission of obscene materials, it "enter[s] upon a constitutional danger area." 433 F.2d at 1257. Very likely Congress has the power to punish those who print and mail obscene photos back to their customers. But the concerns expressed in *Dellapia* provide helpful guidance in determining whether Congress has done so in enacting section 1461.

Application of the statute to a photo processor not only puts him at risk every time he prints and returns a photo containing nudity, it also implicates the constitutional rights of those who send film for developing. If the statute applies to photo processors, it is inevitable that they will err on the side of caution and decline to return some photos that display innocent nudity but are not obscene. The photo processor thus becomes the censor of the nation's photographers. Worse yet, his actions become a particularly obnoxious form of prior restraint: He condemns the photo before anyone, including the photographer or a neutral magistrate, has had an opportunity to see the finished print. A broad construction of section 1461 thus authorizes by indirection a result very similar to the ex parte condemnation that the Supreme Court has prohibited, *A Quantity of Copies of Books v. Kansas,* 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964); *Marcus v. Search Warrant,* 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961). I recognize that every application of section 1461 to a person who distributes someone else's obscene material by mail creates the risk that the distributor will withhold material that he incorrectly concludes is obscene. That risk is tolerable because the originator of the material has numerous outlets of distribution available, and the adverse decision of one distributor does not bar the material from all public scrutiny. But when a photo processor mistakenly concludes that a photo is obscene, he effectively condemns the

---

**3.** Even as to photographers mailing obscene film *to* a photo processor, the reach of section 1461 had been administratively curtailed by the Department of Justice's policy concerning prosecution for mailing private correspondence.

*See Redmond v. United States,* 384 U.S. 264, 86 S.Ct. 1415, 16 L.Ed.2d 521 (1966) (conviction vacated at request of Solicitor General, who advised Court that prosecution was contrary to written policy of Justice Department).

picture, unless the photographer is willing to travel a considerable distance to retrieve his negative.

The Government's construction also leads to an anomalous result. Since section 1461 is violated only by a person who has knowledge of the contents of the materials he mails, *Hamling v. United States*, 418 U.S. 87, 119–24, 94 S.Ct. 2887, 2908–2911, 41 L.Ed.2d 590 (1974), the photo processor who fully automates his plant, eliminating all opportunity for employees to see the finished prints, will very likely avoid prosecution, while the statute will apply to establishments using more conventional equipment.

The risks of construing section 1461 to apply to photo processors were graphically illustrated by one episode in this case and the Government's reaction to it. In preparation for trial, defense counsel sent some of the Government's exhibits to the Eastman Kodak Company to have duplicate prints made. At oral argument, the Government was asked whether Kodak violated section 1461 by mailing the duplicated prints to defense counsel. We were enthusiastically assured that Kodak had violated the statute.

I am questioning only the construction of section 1461, not its constitutionality.[4] If Congress wishes to punish those who print and reproduce obscene photographs and return them to photographers, it may well have constitutional authority to do so. But such regulations should be undertaken with care, as Congress itself has recognized in enacting the limited provisions of 18 U.S.C. § 1737. If a bill amending section 1461 were proposed in Congress explicitly to extend its coverage to photo processors, I have little doubt that the affected industry would be heard from and that, if any such amendment were enacted, it would be carefully written to minimize the problems I have identified. Until Congress makes clear that it wishes to criminalize the action of every photo processor who

mails an obscene photograph back to the photographer who sent the film, I would not apply section 1461 to accomplish such a dangerous result.

In this case, a majority of the panel agrees with the Government's application of section 1461 to photo processors. I am therefore obliged to accept that conclusion, much as I disagree with it, and face the other issues in this case, especially since the other two members of the panel are divided on some of those issues, and the case must be adjudicated. Having expressed my dissenting views on section 1461, I agree with Judge Pratt's disposition of all the other issues in the case except with respect to counts 7 and 9. As to those two counts, I agree with Judge Lumbard that *United States v. Klaw*, 350 F.2d 155 (2d Cir.1965), is properly understood to require expert testimony that material appeals to the prurient interest of a deviant group only when the material portrays conduct not generally understood to be sexual.

LUMBARD, Circuit Judge (concurring in part and dissenting in part).

I concur in the majority's decision affirming appellant's conviction on counts 8, 10, 11 and 12 of the indictment. However, I would affirm the remaining seven counts of the indictment as well.

On count 1 (conspiracy to violate §§ 2251 and 1461), I agree that § 2251 is inapplicable to photoprocessors, and thus that the § 2251 leg of the conspiracy count must be thrown out. However, as the jury convicted Petrov on ten underlying § 1461 offenses, four of which we now affirm, I conclude the jury would certainly have convicted Petrov of conspiracy if count 1 had been addressed to the underlying § 1461 offenses alone. That normally would be sufficient ground to affirm the conspiracy conviction. *See United States v. Anzalone*, 626 F.2d 239, 291 (2d Cir.1980); *United States v. Mack*, 112 F.2d 290, 291 (2d Cir.1940) (where conspiracy to commit mul-

---

**4.** Petrov does not explicitly argue that section 1461 should be construed not to apply to photo processors, but his argument that the statute

may not constitutionally be applied to photo processors obliges us to consider the preliminary issue of the statute's construction.

tiple offenses is charged, proof of only one offense sufficient to sustain conspiracy conviction).

Notwithstanding that general rule protecting the valid leg of a conspiracy conviction, the majority finds that the inclusion of the improper § 2251 charge here so prejudiced the jury as to the valid § 1461 charge as to require reversal of the entire conspiracy count. I disagree. Although the government's introduction of the pictures supporting the § 2251 portion of count 1 undoubtedly did not dispose the jury kindly toward Petrov, five of the eleven underlying § 1461 counts also involved allegedly obscene pictures of children. Thus, the government would have been free to argue that one purpose of the conspiracy was to mail "child pornography" or "obscene pictures involving kids" even if § 1461 had been the sole substantive offense charged as to count 1. Under the circumstances, I fail to see how combining the § 2251 charge with the § 1461 charge significantly increased the likelihood of conviction on count 1.

I have similar reservations about the "spillover" argument as applied to counts 2, 3, 5 & 6. As all four counts were based on photographs of children, the government again would have been free to argue to the jury that appellant was guilty of mailing "child pornography" or "obscene photographs involving kids," whether or not it had charged § 2251 in count 1.

As a result, the only possible "spillover" argument I see as to the § 1461 portion of count 1 and counts 2, 3, 5 or 6 concerns not whether the photographs supporting these counts involve *child* pornography, but whether they are pornographic at all. That is, if the photographs were in fact, as the majority contends, "relatively innocuous" viewed on their own, appellant might have a valid argument that the jury would not have found them to be obscene but for the spillover effect from the clearly obscene photographs of children introduced to support the § 2251 portion of count 1. Having looked at the photographs in question, I conclude that is not the case here. Al-

though the photographs submitted on counts 2, 3, 5, and 6 taken as a whole may be marginally less explicit than those introduced in support of the § 2251 portion of count 1, they were far from "relatively innocuous." Almost all of them depicted children with genitals exposed, standing or lying in sexually suggestive poses. Many are close-up shots of boys' genitals, in several cases with the boys shown fondling themselves, in others, fondling one another. However we might judge the photographs *de novo*, I conclude the jury reasonably could have found them, taken alone, to be pornographic. I would therefore affirm appellant's conviction on counts 1, 2, 3, 5 and 6.

As to counts 7 and 9, Judge Newman and I agree that under *United States v. Klaw*, 350 F.2d 155 (2d Cir.1964), expert testimony is not required to establish the prurient appeal of photographs depicting bestiality. On its facts, *Klaw* applies only to depictions of sadomasochistic activity. The Supreme Court, in endorsing *Klaw* in *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 56 n. 6, 93 S.Ct. 2628, 2634 n. 6, 37 L.Ed.2d 446 (1973), left open the question of what other sexual conduct was so bizarre as to require expert testimony as well. The only court thus far to consider whether the rule in *Klaw* should be extended to depictions of bestiality has held that it should not be. *See United States v. Thomas*, 613 F.2d 787, 794 (10th Cir.), *cert. denied*, 449 U.S. 888, 101 S.Ct. 245, 66 L.Ed.2d 114 (1980) (material included, *inter alia*, depictions of "sexual activities between people and animals," *id.* at 791). That conclusion accords with common sense. The photographs submitted on counts 7 and 9, which I take to be typical of the bestiality genre, depict people in various poses engaged in genital intercourse and oral sex with animals. Unlike the depictions of torture and deformation at issue in *Klaw*, most people would recognize the conduct depicted here as inherently sexual. A jury is therefore competent to evaluate its prurient appeal. *Cf. United States v. Thoma*, 726 F.2d 1191 (7th Cir. 1984) (same with regard to pedophilia); *United States v. Wild*, 422 F.2d 34 (2d

Cir.1970), *cert. denied,* 402 U.S. 986, 91 S.Ct. 1644, 29 L.Ed.2d 152 (1971) (same with regard to homosexuality). Under the circumstances, it seems a pointless exercise to require an expert to testify to what would be self-evident to the average juror. We would thus hold that the jury was competent to determine for itself, without aid of expert testimony, the prurient appeal of the photographs in question here, and affirm appellant's conviction on counts 7 and 9 as well.