United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 27, 2005**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 04-10291

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GARRY LAYNE RAGSDALE;
TAMARA MICHELLE RAGSDALE,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Texas

Before KING, Chief Judge, and BENAVIDES and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

This appeal arises from the defendants', Garry and Tamara Ragsdale, conviction following a jury trial on one count of conspiracy in violation of 18 U.S.C. § 371, and two counts of mailing obscene materials and aiding and abetting in violation of 18 U.S.C. §§ 1461 and 1462. The Ragsdales appeal from their convictions and sentences. They also challenge, on various grounds, the constitutionality of § 1461. For the reasons set forth below, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In 1998, the Dallas Police Department received a complaint from a Berlin resident about pornography sold from www.geschlecht.com.[1] The website, which was entitled "Rape Video Store," advertised that it sold videotapes of actual rapes. The videotapes were separated into two categories on the web site, the "Real Rape Series" and the "Brutally Raped Series." Upon investigating, the Berlin resident determined that the website was registered to Garry Ragsdale ("Garry") of Fort Worth, Texas and he contacted the Dallas/Forth Worth authorities. Detective Doyle Furr was assigned to investigate the complaint. He recognized the name and address of the website owner as that of a fellow Dallas police officer. Furr, using the name Charles Taylor, purchased two videotapes from geschlecht.com that were delivered to an undercover post office box in Dallas, Texas. He later made 6 additional purchases– the eight videotapes he purchased in total constituted the Ragsdales' entire inventory. Two of the videos are alleged to be obscene.

One tape, an hour long Japanese language video entitled "Brutally Raped 5," was touted as being the actual rape of a young woman.[2] In the first half of the video, the woman seems to consensually engage in various sexual activities with as many as three different males. In addition to the protracted depictions of intercourse between her and the men, the remaining half of the video depicts in graphic detail, among other things, her being hoisted up by her ankles upside down with

---

[1] Geschlecht is German for gender or sex.

[2] The description on the web site for the video read: "Want a video of a REAL RAPE? This is no joke, they actually raped a girl and made this video. She is about 20 yrs. old, a very loud screamer, and cries like a baby. In the beginning of this bootleg sex video the girl is a willing participant but quickly realizes she is in way over her head. She pleads for mercy and begs the men to stop. The men tie her up and have their way with her . . . The tape is about an hour long, although I seriously doubt you could stand to watch it that long ."

chains and then being sodomized with various objects and seemingly tortured with hot wax. She is also flogged wit h a whip by a female dominatrix and subsequently sodomized with a baseball bat, which is secured in place with heavy rope. The female and male participants then seem to taunt her while she cries. The second tape, "Real Rape 1," is an hour long Dutch video that depicts a young woman hitch hiker being picked up by a male in a car. She eventually flees from the car into a wooded area where she is pursued by the driver. The man catches up to her and ties her up–first on the ground and later to a tree. There are lengthy zoom lens pictures of her being sodomized. The prosecution argued that what the viewer sees in the next scene is the woman being forced to fellate and then being raped. The video abruptly changes to an indoor location and the woman, who is now tied to a chair, has changed her attire. It then looks as if the man hits her and cut her with a knife. Thereafter, the video shows pro tracted close up shots of male and female genitalia engaged in a variety of sexual acts that the prosecution argued was again non-consensual by the female.

On July 9, 1998, the Federal Bureau of Investigation ("FBI"), in conjunction with the Dallas Police Department and United States Postal Inspectors, obtained a search warrant for the Fort Worth home of Garry and Tamara Ragsdale. The FBI stopped the couple and their two young children as they were driving away from their home. In the vehicle were several packages of the videotapes sold from their online store that the Ragsdales admitted they were about to take to the post office to mail. Garry was placed under arrest. He waived his Miranda rights. He admitted that he owned and managed G Rags, Inc. Thro ugh G Rags, Inc., the Ragsdales sold dietary supplements and pornographic videos on the internet, including "Real Rape 1" and "Brutally Raped 5." Garry was initially charged with obscenity under Texas state law, a Class A misdemeanor, but those charges

3

were later dropped. After 8 years as a Dallas police officer, Garry was fired from his job for conduct unbecoming of an officer.

The officers accompanied Tamara Ragsdale ("Tamara") back to her home where they executed a search warrant. Tamara gave a statement corroborating that she and her husband sold the videotapes at issue on the internet. The Ragsdales conducted business via an AOL account owned by Garry but paid for with a credit card in Tamara's name. She stated that she would duplicate the master videos of the pornographic tapes they offered for sale, often with the monitor off so she would not have to view the activities in the tapes, and she would then mail the duplicated copies to their internet customers. The Ragsdales kept detailed business records that are a part of the appellate record and demonstrate that despite the short four month period the Ragsdales' "Rape Video Store" operated, it still managed to accumulate a large number of customers from all over the world. The Ragsdales shut down the pornography end of their internet business following the FBI raid.

Almost five years later, in March of 2003, Tamara and Garry were each indicted on one count of conspiracy in violation of 18 U.S.C. § 371, and two counts of mailing obscene matter, and aiding and abetting in violation of 18 U.S.C. §§ 1461 and 1462. The indictment alleged that from April 27, 1998 to about July 9, 1998, the Ragsdales' sold obscene materials on the internet. A jury trial commenced on October 14, 2003. The district court appointed separate counsel to represent them. At trial, the couple conceded that they sold the videos but they asserted that the tapes are not obscene. After 5 hours of deliberation, the jury found them both guilty of all charges. The district court sentenced Garry Ragsdale to 33 months' imprisonment, three years' supervised release and a $300 special assessment. The district court sentenced Tamara Ragsdale to 30 months' imprisonment, three years' supervised release, and a $300 special assessment.

4

The Ragsdales now appeal their convictions and sentences. They collectively put forth three points of error: (1) the district court erred in denying their separate motions for judgment of acquittal; (2) the district court erred in refusing to grant a downward departure for each of the defendants for acceptance of responsibility; and (3) the district court erred in raising the defendants' offense level nine levels based on facts that were not proven to the jury beyond a reasonable doubt, in violation of United States v. Booker, 125 S. Ct. 738 (2005). The Ragsdales also challenge the constitutionality of 18 U.S.C. § 1461 on various grounds as well as the constitutionality of the judicially created test for obscenity.

In addition, Garry, alone, raises eight separate issues on appeal, specifically, whether the district court erred in (1) admitting foreign language tapes without requiring the government to translate them; (2) excluding defense evidence of comparable materials; (3) excluding the testimony of Andrew Chatham, a Dallas area attorney; (4) excluding evidence pertaining to an advice of counsel defense; (5) instructing the jury that they could find that the videos appealed to the prurient interest of a deviant group; (6) instructing the jury that the video must "meet" the three prong Miller test; (7) refusing to instruct the jurors that they may find that community standards do not exist; and (8) sentencing him pursuant to the Federal Sentencing Guidelines instead of under the Texas sentencing scheme for violations of state obscenity law.

DISCUSSION

I.      Judgment of Acquittal

The denial of a motion for judgment of acquittal is reviewed *de novo*. United States v. Floyd, 343 F.3d 363, 370 (5th Cir. 2003). "'We will affirm the jury's verdict if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a

5

reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict. Our review of the sufficiency of the evidence does not include a review of the weight of the evidence or of the credibility of the witnesses.'" Id. (citation omitted).

Garry and Tamara were convicted of conspiracy in violation of 18 U.S.C. § 371 and mailing obscene materials and aiding and abetting in contravention of 18 U.S.C. §§ 1461 and 1462. Section 1461 prohibits knowingly using the mail to send any "obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, or substance." Section 1462 prohibits the knowing use of "any express company or other common carrier or interactive computer service . . . for the carriage in interstate or foreign commerce" of "any obscene, lewd, lascivious, or filthy book, pamphlet, picture, [or] motion-picture film[.]" In Roth v. United States, 354 U.S. 476 (1957), the Supreme Court read the terms "obscene, lewd, lascivious, or filthy" used in §§ 1461 and 1462, to refer to the general prohibition of "obscene" materials.

To determine whether a work is obscene, the prosecution must establish that (a) "'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest,'" (b) "'the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law,'" and (c) "'the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.'" Miller v. California, 413 U.S. 15, 24 (1973) (internal citations omitted). This third-prong analysis has become known as the Miller test. The prosecution has the burden of proving each element of the Miller test. Pope v. Illinois, 481 U.S. 497, 507-08 (1987).

6

The Ragsdales argued in their motions for judgment of acquittal that the prosecution did not meet its burden of proof of establishing beyond a reasonable doubt that the materials in question are obscene. Because t he prosecution did not establish this essential element of their offenses, the Ragsdales charged that their motions for judgment of acquittal should have been granted. For the reasons that follow, we disagree. Viewing the evidence in the light most favorable to the verdict, a reasonable trier of fact could conclude that the evidence was sufficient to prove beyond a reasonable doubt that the materials were obscene, and therefore, that each element of the offenses charged were established. Accordingly, the district court properly denied Garry and Tamara Ragsdale's respective motions for judgment of acquittal.

A.    Tamara Ragsdale's Judgment of Acquittal

Tamara Ragsdale contends that the district court erred in dismissing her motion for judgment of acquittal because the prosecution did not present sufficient evidence to prove that the materials in question were obscene. She asserts that there was insufficient evidence to sustain her conviction because the prosecution relied solely on the materials themselves to demonstrate obscenity and did not dispute the testimony of defense expert Dr. Shari Julian, a well-credentialed sex therapist.

Dr. Julian testified that the materials in question did not offend community standards. She based her conclusion on the survey of adult materials she found available in the local community. Dr. Julian stated that she visited several adult bookstores in Dallas. At these bookstores, she asserted that she found videos that contained similar activities to those depicted in the videos in question, namely, bondage, fisting, urolagnia (the use of urine in sexual activities), whipping, candles, and simulated rape and abduction. In addition, she opined that based on her prior experience viewing both simulated and actual rape videos, she found the videos in question to be scenes of simulated rapes

7

rather than non-consensual sex videos.[3] On direct examination, Dr. Julian analyzed the videos frame by frame to illustrate the aspects of the videos that she contends demonstrate that they are scenes of consensual simulated rapes. Finally, she asserted that "Brutally Raped 5" and "Real Rape 1" have scientific value because similar tapes are used in the treatment of sex offenders and in training police officers.

The Supreme Court has accepted that the prosecution may prove the elements of the <u>Miller</u> test without resorting to any evidence or testimony other than the introduction of the allegedly offending materials themselves. <u>Paris Adult Theatre v. Slaton</u>, 413 U.S. 49, 56 (1973); <u>see also</u> <u>Hamling v. United States</u>, 418 U.S. 87, 100 (1974); <u>Thevis</u>, 484 F.3d at 1153 ("expert testimony on the part of the prosecution is not necessary in cases where the materials themselves are available for inspection by the finder of fact"). The Supreme Court postulated that additional evidence beyond the allegedly obscene materials is unnecessary to prove obscenity because "hard-core pornography . . . can and does speak for itself." <u>Paris Adult Theatre</u>, 413 U.S. at 56 n.6. The Court stated that "[t]his is not a subject that lends itself to the traditional use of expert testimony. Such testimony is usually admitted for the purpose of explaining to lay jurors what they otherwise could not understand. No such assistance is needed by jurors in obscenity cases." <u>Id.</u>; <u>Kaplan v. California</u>, 413 U.S. 115, 121 (1973).

Although the Supreme Court opined that expert testimony is unnecessary in obscenity cases, the parties may nonetheless introduce such testimony. <u>Kaplan</u>, 413 U.S. at 121. However, even if

---

[3] We emphasize that the question of whether the videos at issue are of consensual or non-consensual sexual activities is irrelevant to the question of whether the materials are obscene. Whether the materials involve consenting adults is inconsequential to the <u>Miller</u> test and a finding of obscenity vel non.

one or both of the parties does introduce expert testimony, the jury is not bound to accept the opinion of any expert in weighing the evidence. Hamling, 418 U.S. at 100. The jury is free to reject the expert testimony when deliberating on obscenity vel non. As long as there is evidence to support a finding that the materials are obscene, i.e. the introduction of the materials themselves, the jury can disregard expert testimony that argues otherwise. Id.; see also United States v. Various Articles of Obscene Merchandise, No. 2102, 709 F.2d 132, 136 (2d Cir. 1983) ("the parties may introduce relevant evidence of the prevailing community standards; even if such evidence is adduced, however, the trier of fact may nonetheless disregard it and rely exclusively on his own knowledge of views of the average person in the community in making the required determination."). The defense did proffer evidence, in the form of the testimony of Dr. Julian, to bolster its claim that the videos were not obscene. The prosecution did not rebut Dr. Julian's claims with the testimony of a similarly trained expert of its own. However, the prosecution was not required to introduce an expert to counter Dr. Julian's testimony nor was the jury required to credit Dr. Julian's testimony in their deliberations. The jury was free to reject the expert testimony of Dr. Julian as they wished. Even though the prosecution did not introduce evidence to rebut the testimony of Dr. Julian, Supreme Court precedent clearly establishes that the videotapes themselves are sufficient evidence to support the jury's finding of obscenity. The jury was well within its prerogative to reject the notions espoused by Dr. Julian. Tamara's argument to the contrary is unavailing.

On appeal, Tamara also seems to question the jury's qualifications to judge community standards. She argues that "for all that we know, the jurors in this case were a conservative, homogenized bunch who only associated with like-minded persons and who never encountered 'different' people who do not share their attitudes." She contends that there is no evidence that the

9

jurors applied contemporary community standards, rather the verdict only evidenced that the videotapes violated the personal moral standards of "cursorily screened, unelected members of the community." She also points to the testimony of potential, though ultimately rejected, jurors during voir dire to emphasize the difficulty the members of the venire had with the definition of community standards.

We are not persuaded by Tamara's argument that the jury was not qualified to determine the local community standards. The Supreme Court has repeatedly stated its confidence in a juror's ability "to draw on his own knowledge of the views of the average person in the community or vicinage from which he comes for making the required determination, just as he is entitled to draw on his knowledge of the propensities of a 'reasonable' person in other areas of the law." Hamling, 418 U.S. at 104-05 (citations omitted). There has never been a requirement that the prosecution must prove that a jury is qualified to determine local community standards or that the jury ultimately did apply local community standards in rendering their verdict. We therefore reject Tamara's argument.

B.      Garry Ragsdale's Judgment of Acquittal

Garry argues that the prosecution failed to meet its burden of persuasion because they did not identify the deviant group that the videotapes would appeal to, and did not establish that the videotapes appealed to that deviant group's prurient interests. Garry cites no Fifth Circuit cases to support his argument, but instead relies on two Second Circuit cases for the proposition that "where the prurient interest is of a 'deviant segment of society,' the government must not only identify the deviant group, but must also establish that the material in question appeals to that group's prurient interest. Both facts are generally established through the use of expert testimony." United States v.

10

<u>Petrov</u>, 747 F.2d 824, 830 (2d Cir. 1984) (quoting <u>United States v. Klaw</u>, 350 F.2d 155, 166-67 (2d Cir. 1965)).

In <u>Klaw</u>, the Second Circuit held that the photographs in question, which depicted scenes of bondage and torture, appealed to the prurient interests of such a small deviant segment of society when the case went before a jury in the early 1960s, that proof was needed to demonstrate such appeal to the "average man." 350 F.2d at 166. Garry notes that like <u>Klaw</u>, the videos here involve bondage and torture, and therefore, he argues that the prosecution was *required* to identify what deviant group, if any, the materials appealed.[4]

In <u>Petrov</u>, the two concurring judges on the three judge panel agreed that <u>Klaw</u> should be understood to require expert testimony only when the material portrays conduct not generally understood to be sexual. <u>Petrov</u>, 747 F.2d at 836. The <u>Petrov</u> court found that it was sufficient that on cross-examination the defense's expert conceded that photographs depicting genital mutilation and torture are recognized as a psycho-sexual dysfunction and would be sexually arousing for some small minority of individuals. <u>Id.</u> at 830-31.

The Supreme Court has generally recognized that "[obscenity] is not a subject that lends itself to the traditional use of expert testimony," <u>Paris Adult Theatre</u>, 413 U.S. at 56 n.6. There is an exception to this general rule. The Court reserved judgment on the issue of whether expert testimony is required "where contested materials are directed at such a bizarre deviant group that the experience of the trier of fact would be plainly inadequate to judge whether the material appeals to the prurient interest." <u>Id.</u> (citing <u>United States v. Klaw</u>, 350 F.2d 155, 167-68 (2d Cir. 1965)); <u>accord</u> <u>Pinkus v.</u>

---

[4] Garry asserts that we are required to follow <u>Klaw</u>, however, we note that <u>Klaw</u> is not binding authority.

United States, 436 U.S. 293, 303 (1978). The Supreme Court suggested that expert testimony may be necessary only where the materials are so abnormal they may not be recognized as lascivious or erotic to the average juror. Here, the materials at issue are not so far removed from the realm of recognizable sexual conduct that the jurors would be incapable of assessing the prurient appeal of the materials. Cf. United States v. Thomas, 613 F.2d 787 (10th Cir. 1980). "Brutally Raped 5" and "Real Rape 1" contain repeated and prolonged sexual acts of intercourse and sodomy in addition to the violence and bondage depicted. Both videos are exceedingly graphic and appear to purposely prolong certain depictions in order to appeal to prurient interests. The calculated camera angles used in the filming of both videos make it virtually implausible to accept Garry's argument that the jurors were unable to understand the prurient appeal these videos may have. Moreover, if a picture is worth a thousand words, both videos spoke volumes to these jurors. Following our complete review of the record, particularly the tapes, we have no trouble concluding that the jurors were fully capable of following the district court's instructions and applying their common sense perspective to all of the evidence presented at trial.

However, even if the materials are so bizarre as to be beyond the experience of the typical juror, the testimony of Dr. Julian would suffice to establish that the materials appeal to the prurient interests of some segment of the population. Dr. Julian testified on direct examination that the materials would arouse certain individuals. This was further enforced by Dr. Julian's testimony as to the popularity in the adult film/book industry of the activities depicted in the videotapes. Thus, the jury could find that the videos appealed to the prurient interests of a deviant group and the judgment of acquittal was properly denied.

II.     Evidentiary Challenges

We next address the various arguments put forth by Garry challenging the district court's evidentiary rulings. The district court's rulings on exclusion of evidence are reviewed for abuse of discretion. United States v. Sharpe, 193 F.3d 852, 867 (5th Cir. 1999). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." Bocanegra v. Vicmar Servs., Inc., 320 F.3d 581, 584 (5th Cir. 2003). If this court finds an abuse of discretion in admitting or excluding evidence, this court will "review the error under the harmless error doctrine, affirming the judgment, unless the ruling affected substantial rights of the complaining party." Id.

A.      Translation of the Tapes

The allegedly obscene videotapes are in Dutch and Japanese. Relying on the Northern District of Illinois' ruling in United States v. Miscellaneous Pornographic Magazines, 526 F. Supp. 460 ( N.D. Ill. 1981), Garry argues that the prosecution had an obligation to translate the tapes in order to establish that they were obscene. Moreover, Garry argues that because the district court held that the burden was on the defense to translate the videos, it impermissibly shifted the burden of proof under the Miller test to the defense.

In Pornographic Magazines, the Dutch text in the magazines covered 90% of the total page area whereas the allegedly obscene photographs covered approximately 5% of the page area. The Pornographic Magazines court noted that the obscenity standard requires that "the dominant theme of the material taken as a whole appeals to the prurient interest." Roth v. United States, 354 U.S. 476, 489 (1957); see also Kois v. Wisconsin, 408 U.S. 229 (1972) (nude pictures published in a newspaper were not obscene because the pictures were relevant to the theme of the article that it accompanied); United States v. Thevis, 484 F.2d 1149, 1155-57 (5th Cir. 1973) (holding that six of

13

the twelve magazines at issue were not totally without social merit because of the significant portions of literary matter that accomplished the pictures, which alone would be considered obscene).  The Miller test retained the "taken as a whole" language in the third prong of the test, when the jury is asked to determine whether the work "lacks serious literary, artistic, political, or scientific value." 413 U.S. at 25.  Based on the "taken as a whole" language, the Northern District of Illinois held that "[w]here arguably obscene pictures might 'rationally relate' to the protected text, obscenity vel non can be determined only in terms of the work as a whole.  Illustrations obscene if viewed in isolation may not be obscene in the context of an accompanying text." Pornographic Magazines, 526 F. Supp. at 466.  Thus, the Northern District of Illinois held that the foreign text must be translated prior to an obscenity finding in order to determine whether the pictures in context with the text are obscene, with the caveat that materials are only required to be translated "where [the] text is of a sufficient magnitude that it might reasonably 'save' otherwise confiscable illustration."   Id.

    After a careful view of the video tapes at issue here and the applicable law, we find that the district court did not abuse its discretion in refusing to require the prosecution to translate the videos.  The court's thoughtful reasoning in Pornographic Magazines is persuasive and in accordance with Supreme Court authority.  However, even were we to adopt the Northern District of Illinois' ruling, we would still find that  the district court did not abuse his discretion in not requiring the prosecution to translate the foreign language videotapes here.  Admittedly a translation of the videotapes would have assisted the trier of fact in conclusively determining whether the activities portrayed therein were consensual or non-consensual.  However, whether the video tapes qualify as obscenity vel non does not turn on whether the activities portrayed in the tapes are consensual or non-consensual.  A translation of the dialogue in the videos would only be relevant under Pornographic Magazines if the

14

dialogue is sufficient in magnitude such that it might "save" otherwise obscene images because consideration of the dialogue might establish that the work taken as a whole has some serious literary, artistic, political, or scientific value. Unlike the facts in Pornographic Magazines, the "dialogue," and we use that term loosely, here was not so significant in magnitude that it was an abuse of discretion for the district court to conclude that it need not be translated for the jury to assess the constitutionality of the materials.

B.      Comparable Materials

Garry attempted to introduce allegedly comparable visual materials purchased from a local adult video store chain and mainstream bookstores, i n order to prove that the video tapes he sold were acceptable in the local community. Dr. Julian was also prepared to introduce statistics from adult dating sites regarding the percentage of individuals from the Dallas area actively seeking to participate in the type of activities featured in the videotapes. While the district court allowed the defense to introduce two videotapes that they purported were comparable—"Knife Point" and "Dark Room"— the other defense evidence of allegedly comparable materials was excluded based on a finding from the district court that either the materials were not comparable enough to the allegedly obscene tapes at issue or the defense did not show the comparable materials were accepted within the community. We hold that the exclusion of the evidence proffered by the defense was not an abuse of discretion.

The Supreme Court, in rejecting an argument that a trial court erred in excluding allegedly comparable materials, averred that "the availability of similar materials on the newsstands of the community does not automatically make them admissible as tending to prove the non-obscenity of the materials which the defendant is charged with circulating . . . the mere fact that materials similar

15

to the brochure at issue here 'are for sale and purchased at book stores around the country does not make them witnesses of virtue.'" Hamling, 418 U.S. at 125-26. The "mere availability of similar material by itself means nothing more than that other persons are engaged in similar activities." Id. (quoting United States v. Manarite, 448 F.2d 583 (2d Cir. 1971)); see also United States v. Various Articles of Merch., Seizure No. 170, 750 F.2d 596 (7th Cir. 1984). The Supreme Court has stressed that comparable materials that are offered for the sole purpose of demonstrating that materials similar to the allegedly obscene items are sold in the surrounding community, are not necessarily relevant to the subject of the litigation on that basis alone. It was thus well within the range of allotted discretion afforded to the district court to exclude the evidence proffered by the defense. See FED. R. OF EVID. 403 ("evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). Moreover, Garry's argument that comparable materials were necessary to guide the jury in determining the local contemporary community standards is unavailing because a jury can sufficiently rely on their own experiences and judgment to determine community standards. See e.g., Hamling, 418 U.S. at 104-06.

C. Testimony of Andrew Chatham

Garry challenges the district court's refusal to allow Andrew Chatham, a Dallas area attorney, to testify. Garry alleges Chatham has represented individuals charged in state obscenity cases and, as part of his practice, has frequently discussed community standards with potential jurors. Garry proffered Chatham for the purpose of testifying about two jury verdicts that found non obscene materials the defense alleged were comparable materials to the videos at issue here. Chatham would have also allegedly testified that based on his discussions with members of the community,

16

pornographic movies depicting consenting adults falls within contemporary community standards. The district court excluded Chatham's testimony regarding other jury verdicts because the court found it to be irrelevant. In addition, the district court held that presenting Chatham for the purpose of stating what others have told him in regard to their views of community standards is hearsay. The district court held that Garry attempted to offer Chatham as an expert on the issue of contemporary standards, but failed to demonstrate that Chatham is a "witness qualified as an expert by knowledge, skill, experience, training, or education."

On appeal, Garry has abandoned the argument that Chatham should have been allowed to testify as to his expert opinion of community standards and only challenges the exclusion of Chatham's testimony regarding the other jury verdicts. Despite Garry's protest to the contrary, other jury verdicts are not relevant evidence that a defendant is entitled to present. "[J]udicial determinations that particular matters are not obscene does not necessarily make them relevant to the determination of the obscenity of other materials, much less mandate their admission into evidence." Hamling, 418 U.S. at 126-27; see also id. at 101 ("[I]t is common experience that different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system. . . . If consistency in jury verdicts as to the obscenity vel non of identical materials is not constitutionally required, Miller v. California, supra, the same is true a fortiori of verdicts as to separate materials, regardless of their similarities.") (internal citations omitted). Evidence of jury verdicts that declared comparable materials non-obscene does not assist the jury in determining whether the materials in question are obscene or non-obscene. See FED. R. OF EVID 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be

17

without the evidence."). Thus, the district court did not abuse its discretion in refusing to allow Chatham to testify as to allegedly comparable materials that have been found non-obscene by other juries.

D.     Advice of Counsel Defense

Garry Ragsdale entered into the internet pornography business under the tutelage of Thomas Gartman, who invited Garry to be his business partner and gave Garry the obscene tapes.[5] Garry argues that Gartman told him that Lawrence Brown, a former federal prosecutor, assured Gartman that the tapes were highly unlikely to be found obscene by a court and would be protected by the First Amendment. Brown contends he never told Gartman that it was unlikely that the tapes would be found obscene. The district court refused to allow Garry to present this evidence as part of an advice of counsel defense because the legal advice was given to someone other than Garry and was thereby hearsay. Garry asserts that Brown's alleged statements are not hearsay because the testimony is being offered to show the state of mind of Garry, not for proof that Gartman actually spoke with Brown. Garry contends that a corporation can act through its officers and employees for the purpose of obtaining legal advice.

We cannot find that the district court abused its discretion in excluding evidence relating to an advice of counsel defense. The advice of counsel defense is only applicable where it may negate willful violation of the law. See e.g., United States v. Mathes, 151 F.3d 251, 255 (5th Cir. 1998) ("Reliance on counsel's advice excuses a criminal act only to the extent it negates willfulness"). Section 1461 does not require that the defendant have knowledge of the legal status of the materials,

_____

[5] Gartman fled the United States for Canada when the FBI first raided the Ragsdales' home. Although Gartman was later indicted with other co-conspirators, he still remains at large in Canada and he is still selling the videotapes found obscene here on the internet.

defendant need only know the character and nature of the materials. Hamling, 418 U.S. at 120-24. "The inquiry under the statute is whether the [materials] charged to have been obscene, lewd, and lascivious was in fact of that character, and if it was of that character and was deposited in the mail by one who knew or had notice at the time of its contents, the offence is complete, although the defendant himself did not regard the [materials] as one that the statute forbade to be carried in the mails." Id. at 120 (quoting United States v. Rosen, 161 U.S. 41, 42 (1896)). "The statutes here in question do not condition guilt upon knowledge that a federal law has been violated. It is sufficient that the appellants intended to do all of the acts prohibited by the statue and proceeded to do them," United States v. Thaggard, 477 F.2d 626, 632 (5th Cir. 1973). In other words, it is sufficient that the defendant mailed the materials, with the intent to mail them, and knew the content of the materials without necessarily knowing that the materials would be considered obscene. See Thevis, 484 F.3d at 1154. Because § 1461 does not require an intent to violate the law, Garry could not assert as a defense that he relied on advice from counsel that the materials were not illegal. Testimony that Garry's business partner allegedly consulted an attorney, or at least that Garry believed his business partner consulted an attorney, is not relevant when it is entered for the sole purpose of supporting an unassertable defense. Accordingly, it was not an abuse of discretion for the district court to exclude the testimony.[6]

---

[6] In rebuttal, Garry notes that conspiracy is a specific intent crime. Garry is correct that the mens rea for conspiracy requires that the defendant willfully committed an act, or acts, forbidden by the underlying statute. See 18 U.S.C. § 371. However, as discussed *supra*, the underlying statute, § 1461, does not require certain knowledge of the materials' obscenity. Therefore, the mens rea for conspiracy to violate § 1461 requires only an intent to commit the acts prohibited by the statute but not an intent to traffic in materials known to be obscene. See United States v. Hamling, 481 F.2d 307 (9th Cir. 1973), aff'd, 418 U.S. 87 (1974). In order to convict defendants of conspiracy to violate § 1461, the prosecution need only prove beyond a reasonable doubt that the alleged conspirators engaged in a scheme to knowingly use the mail to distribute materials that are obscene, regardless of

19

III.    Jury Instructions

Garry Ragsdale also asserts several points of error regarding the jury instructions given by the district court, specifically, he contends the district court erred in: instructing the jury that they could find that the videos appealed to the prurient interest of a deviant group; instructing the jury that the video must "meet" the three prong Miller test rather than stating that they must find beyond a reasonable doubt that the videos are obscene; and refusing to instruct the jury that they were not required to determine that community standards exist (and concomitantly if they could not determine whether community standards existed, instructing them they must acquit).

The district court's decision to give or exclude a jury instruction is reviewed for abuse of discretion. Dahlen v. Gulf Crews, Inc., 281 F.3d 487, 494 (5th Cir. 2002); United States v. Morales-Palacios, 369 F.3d 442 (5th Cir. 2004). We have carefully reviewed the parties' arguments, the record and the district court's oral renderings, and we find that the district court did not abuse his discretion in the instructions that were given to the jury nor in refusing to give the instruction asserted by Garry.

IV.  Independent constitutional judgment

Despite our conclusion that: there was sufficient evidence to support the jury's finding that the tapes are obscene, the jury was properly instructed, and the district court did not abuse its discretion in excluding certain evidence, we are still required to make an independent constitutional

whether the defendants knew that the materials are obscene. Thus, evidence that Garry or his business partner received advice that the materials are not obscene is, again, irrelevant. Compare United States v. Richards, 204 F.3d 177, 208 (5th Cir. 2000) overruled on other grounds by United States v. Cotton, 122 S. Ct. 1781, 1785 (2002) (although conspiracy is a specific intent crime, conspiracy to commit mail fraud does not require an intent to use the mail because mail fraud does not require a specific intent to use the mail).

20

judgment as to the obscenity of the materials in question. Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 506-07 (1984) (rejecting the contention that a jury finding of obscenity vel non is insulated from review so long as the jury was properly instructed and there is some evidence to support its findings, and stating that appellate courts have the power to conduct an independent review of constitutional claims). The Supreme Court has rejected the suggestion that whether a work is obscene is a factual judgment and jury findings of obscenity are all but conclusive. Jacobellis v. State of Ohio, 378 U.S. 184, 187-90 (1964). The Court held that "[s]ince it is only 'obscenity' that is excluded from the constitutional protection [of the First Amendment], the question whether a particular work is obscene necessarily implicates an issue of constitutional law." Id. The Court stated that to allow jury verdicts to be all but conclusive in this area would be "an abnegation of judicial supervision in this field [] inconsistent with our duty to uphold the constitutional guarantees." Id. As Justice Harlan aptly stated in Roth:

> Every communication has an individuality and 'value' of its own. The suppression of a particular writing or other tangible form of expression is, therefore, an individual matter, and in the nature of things every such suppression raises an individual constitutional problem, in which a reviewing court must determine for itself whether the attacked expression is suppressable [sic] within constitutional standards. Since those standards do not readily lend themselves to generalized definitions, the constitutional problem in the last analysis becomes one of particularized judgments which appellate courts must make for themselves. I do not think that reviewing courts can escape this responsibility by saying that the trier of facts, be it a jury or a judge, has labeled the questioned matter as 'obscene,' for, if 'obscenity' is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but a question of constitutional judgment of the most sensitive and delicate kind.

Roth, 354 U.S. at 497 (1957) (Harlan, J., concurring in part and dissenting in part)

"[I]n 'obscenity' cases as in all others involving rights derived from the First Amendment guarantees of free expression, the Court cannot avoid making an independent constitutional judgment

21

on the facts of the case as to whether the material involved is constitutionally protected." Id.; Bose Corp., 466 U.S. at 508 n.27, 509-10; Miller, 413 U.S. at 25 (stating that if the state statute that regulates obscenity employs the wrong legal standard, First Amendment values are adequately protected by the ultimate power of the appellate courts to make an independent constitutional judgment as to obscenity when necessary); United States v. Thevis, 484 F.2d 1149, 1155 (5th Cir. 1973) (stating that the court is required to make an independent constitutional judgment of whether the magazines at issue were obscene and reversing the defendant's conviction on six counts because the court found that some of the materials were not obscene); United States v. Gates, 481 F.2d 605 (5th Cir. 1973) ("[O]n review of First Amendment cases, the proper course for the appellate court to take is: to make 'an independent constitutional judgment as to the facts of the case as to whether the material involved is constitutionally protected'") (quoting Jacobellis, 378 U.S. at 190); Clicque v. United States, 514 F.2d 923, 926 (5th Cir. 1975) (holding that the court had a constitutional duty to make an independent judgment as to whether the letter at issue was obscene even though the defendant plead guilty to violating § 1461); Penthouse Intern., Ltd. v. McAuliffe, 610 F.2d 1353 (5th Cir. 1980).

The Supreme Court has explicitly stated that the power of appellate courts to make an independent judgment in obscenity cases applies to the second and third prong of the Miller test. Jenkins v. Georgia, 418 U.S. 153, 163-64 (1974) (Brennan, J., concurring).  However, this courts has held that the Supreme Court has implicitly delegated to appellate courts the power to conduct an independent review of the first prong of the Miller test as well.  Penthouse, 610 F.2d at 1363-64.

The first prong of the Miller test asks "whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest."

22

<u>Miller</u>, 413 U.S. at 24 (citation omitted). As previously stated, both videos include exceedingly graphic depictions of a motley of different sexual acts. The camera angles and prolonged close up shots we believe are obviously designed to appeal to the prurient interest. We have no doubt that the average person would find that the videos appeal to the prurient interest. The Government also notes that the Ragsdales marketed these videos to appeal to the erotic interests of their customers, and this pandering could further help establish that the average person would easily be able to find that the videos appeal to prurient interests.

The second prong asks whether the "work depicts or describes, in a patently offensive way, sexual conduct *specifically defined by the applicable state law.*" <u>Miller</u>, 413 U.S. at 24 (emphasis added). "Sexual conduct" is defined in the Texas statutes as "sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola." TEX. PENAL CODE ANN. § 43.25 (a)(2) (Vernon 2002). Arguably both videos depict "deviate sexual intercourse" and "lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola." But we need not decide whether the various sexual acts and sexual intercourse presented in the videos are "deviate" or whether the exhibition of the genitals, anus and breast is lewd or not lewd. Both videos contain depictions of actual sexual intercourse and sado-masochistic abuse, therefore, under the definition of sexual conduct provided for by the Texas legislature both videos clearly depict "sexual conduct." Nonetheless, the second prong of the <u>Miller</u> test is only met when the sexual conduct depicted is also "patently offensive." The sexual conduct portrayed in the videos is not only exceedingly protracted but also intentionally designed to make the viewer believe that the female participant is in a significant amount of pain, distress and

23

danger–whether the pain is simulated or actual is irrelevant. We conclude that the videotapes do depict "patently offensive" sexual conduct. In coming to that conclusion we take into account not only the inordinate length of the acts in the video and the portrayal of excessive torture and pain during the commission of the acts that is intended to seem non-consensual, but also the calculated camera angles and zoom shots employed to display the acts. Cf. Penthouse, 610 F.2d at 1364-66 (holding that based on the court's independent judgment, "Penthouse" and "Oui" do contain patently offensive sexual contact, reversing the district court).

Moreover, after reviewing the videotapes, we conclude that the third prong of the Miller test is also satisfied, namely, that "the work[s], taken as a whole, lack serious literary, artistic, political, or scientific value." Miller, 413 U.S. at 24. We have considered the videotapes as a whole, and it is our independent view that there is no literary, artistic, political, or scientific value to "Brutally Raped 5," and "Real Rape 1." Cf. Id. at 1366-73 (holding that "Penthouse" and "Oui" taken as a whole possess no literary, artistic, political, or scientific value– reversing the district court). Therefore, we affirm the jury's finding that the videotapes in question are obscene based on the established guidelines for obscenity in the case law.

V.      Sentencing

A.      Acceptance of Responsibility

Garry and Tamara Ragsdale argue that the district court erred in not awarding them a reduction at sentencing for acceptance of responsibility. The district court's determination as to whether a defendant has accepted responsibility is afforded great deference on review. United States v. Chapa-Garza, 62 F.3d 118, 120 (5th Cir. 1995) (citing United States v. Franks, 46 F.3d 402, 405 (5th Cir. 1995)); U.S.G.G. § 3E1.1 n.5. "The Fifth Circuit has applied various standards of review

24

for a district court's refusal to credit acceptance of responsibility including: 'clearly erroneous,' 'without foundation,' and 'great deference.' There appears to be no practical difference between these standards, however, the standard is always 'more deferential than a pure clearly erroneous standard.'" Chapa-Garza, 62 F.3d at 120 (internal citations omitted). The defendant bears the burden of proving entitlement to a decrease in offense level for acceptance of responsibility. United States v. Tello, 9 F.3d 1119, 1124 (5th Cir. 1993).

"Normally, one who puts the government to its burden of proof at trial will not qualify" for a reduction for acceptance of responsibility, United States v. Fells, 78 F.3d 168, 171 (5th Cir. 1996), but "[a] defendant is not automatically precluded from receiving a reduction for acceptance of responsibility if he exercises his right to trial." United States v. Brace, 145 F.3d 247, 264 (5th Cir. 1998) (en banc).

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

U.S.S.G. § 3E1.1 n.2; see e.g., United States v. Washington, 340 F.3d 222 (5th Cir. 2003) (holding that mere fact that defendant went to trial to argue in favor of a suppression motion does not preclude acceptance of responsibility reduction because motion to suppress did not challenge factual guilt).

The Ragsdales argue that the district court erred in not awarding them a reduction at sentencing for acceptance of responsibility because they fully cooperated with the pre-trial

investigation, and they voluntarily terminated their business. They also argue that they did not dispute the facts of the charges against them, rather, they only disputed whether the videotapes were obscene, which they contend is a legal question. Because they only disputed a legal issue, they contend that they thereby fall within that rare category of circumstance where a defendant demonstrates acceptance of responsibility even though they exercised their right to trial.

A defendant who exercises his right to trial in order to challenge his factual guilt will not qualify for an acceptance of responsibility reduction. See U.S.S.G. § 3E1.1 n.2. The Supreme Court has repeatedly stated that whether the allegedly obscene materials satisfy the three part Miller test is an "issue[] of fact for the jury to determine applying contemporary community standards." Pope, 481 U.S. at 500; accord Smith v. United States, 413 U.S. 291, 301 (1977). Tamara's brief even recognizes that the application of the Miller test is a question of fact for the jury. (Br. of Appellant at 23 n.12.) To argue the contrary, the Ragsdales rely on the Supreme Court's statement in Hamling that "the definition of obscenity [] is not a question of fact, but one of law; the word 'obscene,' as used in 18 U.S.C. § 1461, is not merely a generic or descriptive term, but a legal term of art." 418 U.S. at 118. While the definition of obscenity is a legal conclusion, whether a work qualifies as obscenity *vel non* as applied to the facts of a particular case is a question of fact. By going to trial to dispute whether the materials satisfy the test under Miller for obscenity vel non, the Ragsdales were challenging their factual guilt; thus, they do not qualify for a sentencing credit under the rare circumstance where the defendant proceeds to trial but can still qualify for a § 3E1.1 reduction.[7] Cf.

_____

[7] Even assuming *arguendo* that obscenity vel non was a legal question, Tamara Ragsdale did challenge certain factual assertions put forth by the prosecution. For example, Tamara and her trial counsel at times challenged the prosecution's assertion that Tamara saw what was on the video tapes or knew of their contents in what seemed to be an argument that Tamara lacked the requisite scienter necessary to convict under § 1461. See Hamling, 418 U.S. at 120-124; Thevis, 484 F.3d at 1153 (in

26

Brace, 145 F.3d at 265 (although defendant admitted committing the criminal acts, his assertion of entrapment was a denial of factual guilt, because it is a denial of the subjective predisposition and, consequently, of the required element of mens rea; thus, he was not entitled to a 3E1.1 reduction).

B.      Booker violation

Garry and Tamara Ragsdale argue that the district court impermissibly increased their offense level by 9 levels based on the district court's findings of fact that were not proven to a jury beyond a reasonable doubt.  Specifically, they challenge the district court's findings that the videos were "distributed for pecuniary gain" and "the material portrayed sadistic or masochistic conduct or other depictions of violence."

The indictment charged the Ragsdales with conspiring with one another to knowingly use the mail for the delivery of obscene video tapes.   The indictment alleged that the conspiracy was conducted as part of a business that duplicated and distributed obscene video tapes to paying customers.  In furtherance of the conspiracy, the indictment alleged that a customer would place an order through a web site owned by Garry.  The customer's credit card payment was processed through an account paid for by Tamara.  The videos were then dubbed at the Ragsdales' home and shipped from a location in Dallas, Texas, using the United States mail.  At trial, Tamara admitted that she and her husband made approximately $20,000 during the roughly two months that they are alleged to have offered the obscene videos for sale.  It is clear from the indictment and the trial transcripts that the fact that the videos were distributed for pecuniary gain was not a judicial finding

order to met its burden of proving the necessary scienter under § 1461, the prosecution has to establish that the defendant knew the nature of the contents of the materials they put in interstate commerce).  Tamara and her trial counsel at times also attacked the prosecution's assertions as to the extent of her involvement in the business of ordering the videotapes.  Consequently, Tamara would still be precluded from receiving the § 3E1.1 reduction.  See U.S.S.G. § 3E1.1, n.1.

made in contravention of the Sixth Amendment, but rather was a fact charged in the indictment, admitted by the defendants and supported by the jury verdict. However, the finding that the materials depicted sadistic or masochistic conduct, or scenes of violence, were findings of fact beyond those permitted by the jury's verdict.

Neither defendant objected to the increase of their sentence based on the district court's extra-judicial findings at sentencing. The ruling that the material involved sadomasochistic material increased the offense level four levels. The resulting offense level of 19 for both defendants mandated a guideline range of 30 to 37 months imprisonment. Based on the jury's verdict, the Ragsdales offense level should have been set at 15, which would have permitted the district court to sentence them each to 18 to 24 months imprisonment, pursuant to the applicable guidelines' range. The district court increased the Ragsdales' sentences beyond the maximum prescribed range authorized by the jury's verdict based on findings that were not proven to the jury beyond a reasonable doubt nor admitted by the defendants. Thus, the district court violated the Ragsdales' Sixth Amendment rights. See Booker, 125 S. Ct. at 755-56; see also United States v. De Jesus Batres, 2005 WL 1155677 (5th Cir. May 17, 2005). The Ragsdales failed to object to the increase in their sentences on this basis in the district court and therefore our review is only for plain error.

"An appellate court may not correct an error the defendant failed to raise in the district court unless there is (1) error, (2) that is plain, and (3) that affects substantial rights." United States v. Mares, 402 F.3d 511, 520 (5th Cir. 2005) (citation omitted). "If all three conditions are met an appellate court may then exercise its discretion to notice a forfeited error but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (citation and quotations omitted). Under Mares, a Booker error of this type satisfies the first two prongs of the

plain error analysis. Id. at 520-21. Thus, the material question is whether the error affected the Ragsdales' substantial rights.

The defendant has the burden to show that the error affected his substantial rights. Id. at 521. The Ragsdales must demonstrate that there is a probability that the error affected the outcome of the district court proceedings, "a probability 'sufficient to undermine confidence in the outcome.'" Id. (citation omitted). They have not met their burden if it is "equally plausible that the error worked in favor of the defense," or "if the effect of the error is uncertain so that we do not know which, if either, side it helped[.]" Id. (citation and quotations omitted).

After carefully reviewing the parties' arguments and the record in this case, we find that the Ragsdales cannot establish that the outcome of the district court proceedings would have been any different absent the Sixth Amendment error, i.e., under an advisory sentencing system.[8] Because the Ragsdales have failed to meet their burden of persuasion, we decline to find that the Sixth Amendment violation at trial constituted plain error.

C.    Federal Sentencing Guidelines

Garry also objects to the application of the Federal Sentencing Guidelines to his case on the grounds that the Miller test is based on local standards, and therefore, his sentencing should be based on local standards. He contends that the local community, through the Texas legislature, has determined that obscenity should be treated as a Class A misdemeanor punishable by up to one year

---

[8] We note that as to Tamara Ragsdale, the district court had the discretion to depart downward from the Guidelines range based on several grounds set forth by Tamara. Although the district court acknowledged that he had the discretion to depart downward from the Guidelines range, he declined to do so.

in the county jail. He argues that any sentence imposed upon him that exceeds one year violates his due process rights.

First, Garry's argument ignores the fact that TEXAS CODE CRIM. PRO § 43.23, which governs an obscenity violation in Texas, and 18 U.S.C. § 1461 are not identical. The test for a violation of obscenity law in Texas does closely parallel the Miller test, see Castillo v. State, 79 S.W.3d 817 (Tex. App.-Dallas 2002), but importantly, the Texas obscenity statute simply prohibits the promotion of obscene materials whereas § 1461 requires the additional element of the use of the mail. The Supreme Court in Smith recognized that "[t]he regulation of the mails is a matter of particular federal concern, and the nationwide character of the postal system argues in favor of a nationally uniform construction of § 1461. The Constitution itself recognizes this fact, in the specific grant to Congress of power over the postal system. Art. I, s 8, cl. 7." Smith, 431 U.S. at 304 n.10. To the extent we may accept Garry's premise that the local community has spoken through the Texas legislature as to how they think a Texas obscenity violation should be punished, that still does not support his argument that the Texas statute should govern how he should be sentenced because the Texas statute is not parallel to his offense.

Secondly, Garry's argument must fail because the Supreme Court has considered and rejected an averment analogous to Garry's. In Smith, the Supreme Court rejected the argument that the Iowa state obscenity statutes had any effect on the prosecution of § 1461. 431 U.S. at 303. The defendant in Smith argued that state laws circumscribed the definition of community standards that the jury could apply when deliberating as to obscenity vel non. Id. The Smith Court first noted that the state statute did not conclusively speak to the attitudes of the local community as to their views on obscenity. Id. at 307. But more importantly, the Smith Court held that the state statute cannot have

30

conclusive effect on federal law; instead prosecution under § 1461 is decidedly a federal question. Id. at 304. "The language of § 1461 gives no indication that Congress intended to adopt state laws relating to distribution of obscene material for purposes of the federal statute, nor does its history." Id.

VI.     Constitutionality of § 1461 and the Miller test

Finally, the Ragsdales assert several constitutional arguments challenging the validity of both § 1461 and the Miller test for obscenity vel non. First, they argue that § 1461 violates the First Amendment because obscenity should be protected under the First Amendment. Second, they argue that § 1461 contravenes the First Amendment because it violates the right to privacy. Third, they submit that § 1461 is unconstitutionally vague and overbroad. Fourth, they contend that § 1461 offends due process of law because different juries may view identical materials and render different verdicts. Finally, they argue that the Miller test violates due process because it requires unelected jurors to determine what is obscene instead of the government defining it first. However, the Ragsdales acknowledge that their arguments are foreclosed by Supreme Court precedent. See generally Roth v. United States, 354 U.S. 476 (1957); Miller v. California, 413 U.S. 15 (1973); Paris Adult Theatre v. Slaton, 413 U.S. 49 (1973); Hamling v. United States, 418 U.S. 87 (1974); Smith v. United States, 413 U.S. 291 (1977). They assert their constitutional arguments for the purpose of preserving them for Supreme Court review. Based on valid Supreme Court authority, we uphold the validity of § 1461 and the Miller test, and we reject the Ragdales' criticism of their conviction on this basis.[9]

---

[9] After all the briefing was filed in this appeal, Garry Ragsdale submitted a motion for leave to file a supplemental brief. It was not until that supplemental brief that Garry asserted an additional constitutional argument charging that § 1461 violates the substantive due process rights of individuals

31

CONCLUSION

For the foregoing reasons, we AFFIRM Garry and Tamara Ragsdales' respective convictions and sentences.

AFFIRMED.

---

who have a right to possess obscene materials in their home, a liberty interest he contends was established in Stanley v. Georgia, 394 U.S. 557 (1969). But see United States v. 12 200-Foot Reels of Super 8mm. Film, 413 U.S. 123, 126-30 (1973) (holding that Stanley stands only for the proposition that individuals have the right to the privacies of home, and rejecting the argument that Stanley established a right to acquire or possess obscene materials). Garry has seized upon the musing of the dissenters in Lawrence v. Texas, 539 U.S. 558 (2003), who lamented that obscenity laws cannot survive after Lawrence because the Government no longer has a rational basis to abrogate this constitutional right in the face of the Lawrence majority's disavowment of morality as a valid governmental interest. His arguments are made all the more attractive by the Western District of Pennsylvania recent acceptance of similar averments in United States v. Extreme Assocs, 352 F.Supp.2d 578 (W.D. Pa. 2005). Garry asks us to find that the Lawrence Court *implicitly* overruled the numerous cases in which the Court had upheld the validity of § 1461. We need not reach this issue. We deem abandoned those issues not raised in an appellant's initial brief and we will not consider those issues not raised in the trial court. St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 445 (5th Cir. 2000). Garry's substantive due process argument was neither raised in the trial court nor raised in his initial brief. It was therefore waived.